## SIZEMORE *v.* BRADY.

ERROR TO THE SUPREME COURT OF THE STATE OF
OKLAHOMA.

No. 59.   Submitted November 4, 1914.—Decided December 21, 1914.

The Original Creek Agreement of March 1, 1901, was not a grant *in præsenti* which invested the then living members of the tribe and their heirs with absolute rights that could not be recalled or impaired by Congress without violating the due process clause of the Fifth Amendment.

Unless and until the Original Creek Agreement of 1901 was carried into effect Congress possessed plenary power as before to deal with the lands and funds to which it related as tribal property. *Choate* v. *Trapp,* 224 U. S. 665.

The Supplemental Creek Agreement of 1902 and the Act of May 27, 1902, repealing the provisions of the act of March 1, 1901, recognizing the tribal laws of descent and distribution, and declaring that the descent and distribution of Creek lands and moneys should be in accordance with the specified laws of Arkansas, were valid acts within the plenary power of Congress to deal with Indians and their tribal property.

An exertion of the administrative control of the Government over tribal property of tribal Indians is subject to change by Congress at any time before it is carried into effect and while tribal relations continue.

The descent and distribution of a Creek Indian Allotment, not selected or made until after the Supplemental Creek Agreement of 1902 went into effect, are controlled under that agreement by Chapter 49 of Mansfield's Digest of the Law of Arkansas.

Under Chapter 49 of Mansfield's Digest of the Law of Arkansas a paternal cousin of the intestate inherits real estate to the exclusion of maternal cousins.

33 Oklahoma, 169, affirmed.

THE facts, which involve the construction of the provisions in the Original and Supplemental Creek Agreements regarding the descent and distribution of Creek Indian Allotments, are stated in the opinion.

Mr. Frederick E. Chapin, Mr. Andrew B. Duvall and Mr. James B. Diggs for plaintiffs in error:

Where an enrolled member, a citizen of the Creek Tribe or Nation of Indians, who dies prior to the going into effect of the act of March 1, 1901, 31 Stat. 861, known as the Creek Agreement, was, under the terms of such treaty, entitled to receive an allotment, and died without having selected or received such allotment, the allotment such citizen would have been entitled to under the treaty had he lived to select and receive the same descends to his heirs under the Original Creek Agreement. These heirs are to be ascertained as of the date of the death of such enrolled Creek citizen, and the right of the heirs of such enrolled member or citizen of the Creek Nation to such allotment is a vested right, which cannot be impaired or taken away by subsequent legislation. In support of these contentions see *Aspey* v. *Barry*, 83 N. W. Rep. 91; *Auman* v. *Auman*, 21 Pa. St. 348; *Aytlett* v. *Swope*, 17 S. W. Rep. 208; *Ballentine* v. *Wood*, 9 Atl. Rep. 582; *Barclay* v. *Cameron*, 35 Texas, 242; *Barnett* v. *Way*, 119 Pac. Rep. 418; *Best* v. *Dow*, 18 Wall. 112; *Borgner* v. *Brown*, 33 N. E. Rep. 92; *Brown* v. *Belmarde*, 3 Kansas, 35; *Brooks* v. *Kip*, 35 Atl. Rep. 658; *Burke* v. *Modern Woodmen*, 84 Pac. Rep. 275; *Choate* v. *Trapp*, 224 U. S. 665, 671; *Cark* v. *Lord*, 20 Kansas, 390; *Cooper* v. *Wilder*, 43 Pac. Rep. 590; *Crews* v. *Burcham*, 1 Black, 352; *Dem. Man* v. *Wilson*, 23 How. 461; *Donivan* v. *Pitcher*, 53 Alabama, 411; *Doren* v. *Gillum*, 35 N. E. Rep. 1101; *Drew* v. *Carroll*, 28 N. E. Rep. 148; *Durbin* v. *Redman*, 40 N. E. Rep. 133; *Fabens* v. *Fabens*, 5 N. E. Rep. 650; *Gilmore* v. *Morrill*, 8 Ver. 74; *Goodrich* v. *O'Connor*, 52 Texas, 375; *Gould* v. *Tucker*, 105 N. W. Rep. 624; *Gray* v. *Coffman*, 10 Fed. Cas. 1003; *Ground* v. *Dingman*, 127 Pac. Rep. 1078; *Hall* v. *Russell*, 101 U. S. 503; *Haun* v. *Martin*, 86 Pac. Rep. 371; *Hayes* v. *Barringer*, 168 Fed. Rep. 221; *Halstead* v. *Hall*, 60 Maryland, 209; *Henry Gas Co.* v. *United States*, 191

Fed. Rep. 137; *Hobbie* v. *Ogden*, 53 N. E. Rep. 106; *Irving* v. *Diamond*, 100 Pac. Rep. 557; *Jackson* v. *Lyon*, 9 Cowan, 664; *Johnson* v. *Norton*, 10 Pa. St. 245; *Jones* v. *Meehan*, 175 U. S. 1, 11; *Jumbo Cattle Co.* v. *Bacon*, 79 Texas, 5; *Leathers* v. *Gray*, 2 S. E. Rep. 455; *McCrea's Appeal*, 36 Atl. Rep. 412; *McKee* v. *Henry*, 201 Fed. Rep. 74; *Meadowcroft* v. *Winnebago Co.*, 54 N. E. Rep. 949; *Mullen* v. *United States*, 224 U. S. 448; *Niles* v. *Anderson*, 5 How. 365, 383; *Prentice* v. *Stearns*, 113 U. S. 435; *Reichert* v. *Felps*, 6 Wall. 160; *Reynolds* v. *Fewell*, 124 Pac. Rep. 623; *Rock Hill College* v. *Jones*, 47 Maryland, 1; *Shallenberger* v. *Fewell*, 124 Pac. Rep. 617; *Shulthis* v. *McDougal*, 170 Fed. Rep. 529; *Spangenberg* v. *Guiney*, 3 Ohio Dec. 163; *Starnes* v. *Hill*, 112 Nor. Car. 1; *Starr* v. *Hamilton*, 22 Fed. Cas. 1107; *Stratton* v. *McKinne*, 62 S. W. Rep. 636; *Tate* v. *Townsend*, 16 Mississippi, 316; *Turner* v. *Fisher*, 222 U. S. 204; *United States* v. *Brooks*, 10 How. 42, 460; *Walker* v. *Ehresman*, 111 N. W. Rep. 219; *Ward* v. *Stow*, 27 Am. Dec. 239; *White* v. *Martin*, 66 Texas, 340; *Wilburn* v. *Wilburn*, 83 Indiana, 55; *Wittenbrook* v. *Wheadon*, 60 Pac. Rep. 664; *Wray* v. *Doe*, 10 Smedes & M. 452, 461.

If the act of June 30, 1902, 32 Stat. 500, known as the Supplemental Creek Agreement which was in force at the time of the selection of the land, determines the heirs, such agreement is prospective in operation, and does not, and was not intended to, operate on or affect the estates of members or citizens of the Creek Tribe or Nation who died prior to the going into effect of the Supplemental Agreement; but such Supplemental Agreement was passed for the purpose of affecting, and was intended to affect, only the descent of estates where such descent took place after its going into effect. *Carroll* v. *Carroll*, 16 How. 275; *Chew Heong* v. *United States*, 112 U. S. 536; *City R. R.* v. *Citizens Railway*, 166 U. S. 557; *Murry* v. *Gibson*, 151 How. 421; *United States* v. *Peggy*, 1 Cranch, 103; *White* v. *United States*, 101 U. S. 545; note 12, L. R. A. 50.

*Mr. Grant Foreman* and *Mr. James D. Simms* for defendant in error:

A duly enrolled citizen of the Creek Nation who died on March 1, 1901, without having selected an allotment of land, died seized and possessed of no interest either legal or equitable in the domain of the Creek Nation, and no persons claiming to be his heirs at any time after his death and before allotment had a vested right to land to be allotted in his name or right. They had a mere expectancy, subject to be changed or extinguished by subsequent acts of Congress. *McKee* v. *Henry*, 201 Fed. Rep. 74; *Braun* v. *Bell*, 192 Fed. Rep. 427; *Shellenbarger* v. *Fewel*, 124 Pac. Rep. 617.

The mere right to allot land of the Creek Nation was not a vested right before it was exercised, because it was subject at any time to be withdrawn. *Gritts* v. *Fisher*, 224 U. S. 640; *Stephens* v. *Cherokee Nation*, 174 U. S. 445; *Cherokee Nation* v. *Hitchcock*, 187 U. S. 294; *Hayes* v. *Barringer*, 168 Fed. Rep. 221; *Wallace* v. *Adams*, 143 Fed. Rep. 716; *Woodbury* v. *United States*, 170 Fed. Rep. 302.

For analogous cases under preëmption laws, see: *Emblen* v. *Lincoln Land Co.*, 102 Fed. Rep. 559; *Hutchings* v. *Low*, 15 Wall. 77; *Frisbie* v. *Whitney*, 9 Wall. 187; *Campbell* v. *Wade*, 132 U. S. 34.

The lands of the Creek Nation before allotment were held by the Tribe for the common use of the members, and no right in severalty could be asserted by any member. *Cherokee Nation* v. *Hitchcock*, 187 U. S. 292; *Delaware Indians* v. *Cherokee Nation*, 193 U. S. 127; *Eastern Band* v. *United States*, 117 U. S. 288; *Ligon* v. *Johnson*, 164 Fed. Rep. 670; *Stephens* v. *Cherokee Nation*, 174 U. S. 488.

Congress had full power to make laws of descent in Indian Territory, independently of the Indians or other people residing there; but the Muskogee or Creek Tribe were under the special guardianship of Congress and it had plenary authority over them. *McKee* v. *Henry*, 201 Fed. Rep. 74;

*Lone Wolf* v. *Hitchcock,* 187 U. S. 553; *United States* v. *Kagama,* 118 U. S. 375; *Tiger* v. *Western Investment Co.,* 221 U. S. 286; *Choctaw Nation* v. *United States,* 119 U. S. 1.

The selection or allotment of the land was the initiatory step and was prerequisite to the vesting of any individual title or interest in the land of the tribe. *Hooks* v. *Kennard,* 28 Oklahoma, 457; *deGraffenried* v. *Iowa Land Co.,* 20 Oklahoma, 687; *McKee* v. *Henry,* 201 Fed. Rep. 74; *Braun* v. *Bell,* 192 Fed. Rep. 427; *Hayes* v. *Barringer,* 168 Fed. Rep. 221.

The purpose of § 28 of the Original Creek Agreement was to establish a basis for the allotment of the lands of the tribe. A legislative grant to any member or the vesting of rights by any method other than by allotment is foreign to the general purpose of the act and is not expressed nor intended.

If decedent had no vested right in this land before allotment, no greater estate vested in his heirs.

Application of § 6 of the Creek Supplemental Agreement changing the rule of descent of lands allotted after the act, in the right of citizens dying before the act, is not to be denied on the ground that it would operate retrospectively. In view of the purpose to be accomplished and the state of the subject-matter, the operation was not retrospective. The power reposed in Congress and the legislation discloses the intention to make all lands allotted to heirs after the date of the act, descend according to the rule of descent in force at the date of the allotment, regardless of what rule of descent was in force before the act. *Stephens* v. *Cherokee Nation,* 174 U. S. 445; *McKee* v. *Henry,* 201 Fed. Rep. 74; *Braun* v. *Bell,* 192 Fed. Rep. 427.

Allotment was necessary to segregate and vest a member's interest in lands of the tribe. *Choate* v. *Trapp,* 224 U. S. 665.

Reason for the amendment is found in § 6 of the Supplemental Agreement.

MR. JUSTICE VAN DEVANTER delivered the opinion of the court.

This was a suit to determine conflicting claims to an allotment selected and made after August 8, 1902, on behalf of Ellis Grayson, a Creek citizen duly entitled to enrollment, who died unmarried March 1, 1901, leaving as his only surviving relatives three first cousins, one on the paternal and two on the maternal side. All were Creek citizens. In the papers evidencing the selection and approval of the allotment, as also in the ensuing tribal deed, the beneficiaries were designated as the "heirs" of the deceased, without otherwise naming them; and this was in accord with the usual practice. The suit was brought by the paternal cousin, who insisted that the title under the allotment and tribal deed passed to him alone. The others were made defendants and answered asserting an exclusive right in themselves. Each side also advanced an alternative claim that the three took the land in equal parts. Two questions of law were involved: First, whether the beneficiaries were to be ascertained according to the Creek tribal law or according to an Arkansas law presently to be noticed; and, second, whether the governing law preferred either paternal or maternal relatives when all were of the same degree. The trial court, concluding that the tribal law was applicable and preferred maternal relatives, gave judgment for the defendants; but the Supreme Court of the State held that the Arkansas law was controlling and preferred paternal relatives, so the decision below was reversed with a direction that judgment be entered for the plaintiff. 33 Oklahoma, 169. The defendants then sued out this writ of error.

Anterior to the legislation which we must consider, the Creek lands and funds belonged to the tribe as a community, and not to the members severally or as tenants in common. The right of each individual to participate in

the enjoyment of such property depended upon tribal membership, and when that was terminated by death or otherwise the right was at an end. It was neither alienable nor descendible. Under treaty stipulations the tribe maintained a government of its own, with legislative and other powers, but this was a temporary expedient and in time proved unsatisfactory. Like other tribal Indians, the Creeks were wards of the United States, which possessed full power, if it deemed such a course wise, to assume full control over them and their affairs, to ascertain who were members of the tribe, to distribute the lands and funds among them, and to terminate the tribal government. This Congress undertook to do. The earlier legislation was largely preliminary and need not be noticed.

The first enactment having a present bearing is that of March 1, 1901, c. 676, 31 Stat. 861, called the Original Creek Agreement, which went into effect May 25, 1901, 32 Stat. 1971. It made provision for a permanent enrollment of the members of the tribe, for appraising most of the lands and allotting them in severalty with appropriate regard to their value, for using the tribal funds in equalizing allotments, for distributing what remained, for issuing deeds transferring the title to the allotted lands to the several allottees, and for ultimately terminating the tribal relation. In § 28 this act directed that the enrollment, except as to children, should include "all citizens who were living" on April 1, 1899, and entitled to enrollment under the earlier legislation, and then declared that "if any such citizen has died since that time, or may hereafter die, before receiving his allotment of lands and distributive share of all the funds of the tribe, the lands and money to which he would be entitled, if living, shall descend to his heirs according to the laws of descent and distribution of the Creek Nation, and be allotted and distributed to them accordingly."

So much of that act as recognized the tribal laws of descent and distribution was repealed by the act of May 27, 1902,[1] c. 888, 32 Stat. 245, 258, which also provided: "and the descent and distribution of the lands and moneys provided for in said act [March 1, 1901] shall be in accordance with the provisions of chapter forty-nine of Mansfield's Digest of the Statutes of Arkansas in force in Indian Territory." This was repealed, with a qualification not material here, in § 6 of the act of June 30, 1902, c. 1323, 32 Stat. 500; called the Supplemental Creek Agreement, which went into effect August 8, 1902. See 32 Stat. 2021; *Tiger* v. *Western Investment Co.*, 221 U. S. 286, 301.

Ellis Grayson was living April 1, 1899, and entitled to enrollment. Had he lived he would have been entitled, under the original agreement, to participate in the allotment and distribution of the tribal property. But he died March 1, 1901, before the agreement went into effect and without receiving any part of the lands or funds of the tribe. In these circumstances the agreement contemplated that his heirs should take his place in the allotment and distribution and should receive "the lands and money to which he would be entitled, if living;" and it also contemplated that effect should be given to the Creek laws of descent and distribution in determining who were his heirs and in what proportions they were to take the property passed to them in his right. But, as before said, the act of May 27, 1902, and the supplemental agreement repealed the provision giving effect to the Creek laws of descent and distribution and substituted in their stead the laws of Arkansas embodied in Chapter 49 of Mansfield's Digest. This change went into effect before the allotment in question was selected or made, and has an important

---

[1] This act went into effect July 1, 1902. See Joint Resolution No. 24, 32 Stat. 742.

bearing here, because, according to the Creek laws,[1] the maternal cousins were either the sole heirs or joint heirs with the paternal cousin, while according to the Arkansas laws [2] the paternal cousin was the only heir.

On the part of the maternal cousins it is contended that the provisions in the original agreement relating to the allotment and distribution of the tribal lands and funds were in the nature of a grant *in præsenti* and invested every living member of the tribe and the heirs, designated in the tribal laws, of every member who had died after April 1, 1899, with an absolute right to an allotment of lands and a distributive share of the funds, and that Congress could not recall or impair this right without violating the due process of law clause of the Fifth Amendment to the Constitution. To this we cannot assent. There was nothing in the agreement indicative of a purpose to make a grant *in præsenti*. On the contrary, it contemplated that various preliminary acts were to precede any investiture of individual rights. The lands and funds to which it related were tribal property and only as it was carried into effect were individual claims to be fastened upon them. Unless and until that was done Congress possessed plenary power to deal with them as tribal property. It could revoke the agreement and abandon the purpose to distribute them in severalty, or adopt another mode of distribution, or pursue any other course which to it seemed better for the Indians. And without doubt it could confine the allotment and distribution to living members of the tribe or make any provision deemed more reasonable than the first for passing to the relatives of deceased members the lands and money to which the latter would be entitled, if living. In short, the power of Congress was not exhausted or restrained by the

---

[1] Perryman's Compiled Creek Laws of 1890, p. 32, § 6; Bledsoe's Indian Land Laws, 2nd ed., § 829.

[2] Mansfield's Digest, § 2532.

adoption of the original agreement, but remained the same thereafter as before, save that rights created by carrying the agreement into effect could not be divested or impaired. *Choate* v. *Trapp*, 224 U. S. 665, 671.

In principle it was so held in *Gritts* v. *Fisher*, 224 U. S. 640. There an act or agreement of 1902 had made provision for allotting and distributing the lands and funds of the Cherokees in severalty among the members of the tribe who were living on September 1, 1902, and an act of 1906 had directed that Cherokee children born after September 1, 1902, and living on March 4, 1906 should participate in the allotment and distribution. By enlarging the number of participants the later act operated to reduce the distributive share to which each would be entitled, and because of this the validity of that act was called in question, the contention being that the prior act confined the allotment and distribution to the members living on September 1, 1902, and therefore invested them with an absolute right to receive all the lands and funds, and that this right could not be impaired by subsequent legislation. This court rejected the contention and said (p. 648): "'No doubt such was the purport of the act. But that, in our opinion, did not confer upon them any vested right such as would disable Congress from thereafter making provision for admitting newly born members of the tribe to the allotment and distribution. The difficulty with the appellants' contention is that it treats the act of 1902 as a contract, when 'it is only an act of Congress and can have no greater effect.' *Cherokee Intermarriage Cases*, 203 U. S. 76, 93. It was but an exertion of the administrative control of the Government over the tribal property of tribal Indians, and was subject to change by Congress at any time before it was carried into effect, and while the tribal relations continued. *Stephens* v. *Cherokee Nation*, 174 U. S. 445, 488; *Cherokee Nation* v. *Hitchcock*, 187 U. S. 294; *Wallace* v. *Adams*, 204 U. S. 415, 423.''

We have seen that the allotment in question was not selected or made until after the supplemental agreement went into effect. The heirs designated in chapter 49 of Mansfield's Digest were therefore the true beneficiaries. According to its provisions, as is conceded, the paternal cousin was the sole heir.

*Judgment affirmed.*