## UNITED STATES v. TIGER et al.

Circuit Court of Appeals, Eighth Circuit.
April 4, 1927.

No. 7106.

1. Indians ⬤18—Allotted land of seven-eighths Creek Indian dying intestate descended under Oklahoma law, authorizing inheritance by Choctaw husband (Rev. Laws, Okl. 1910, § 8418; Creek Supplemental Agreement, § 6; Act May 27, 1908, § 9 [35 Stat. 315]).

Allotted lands of seven-eighths Creek Indian dying intestate held to descend under Rev. Laws Okl. 1910, § 8418, so that husband, who was an enrolled Choctaw inherited part thereof, since section 6 of the Creek Supplemental Agreement (32 Stat. 501), providing that only Creek citizens may inherit allotted lands, was repealed by Act May 27, 1908 (35 Stat. 315), section 9 of which act operates to remove restrictions applicable to instant case.

2. Indians ⬤18—Indian allotted lands become subject to state laws, including those of descent, on removal of restrictions of alienation (Act May 27, 1908, § 9 [35 Stat. 315]).

On removal of restrictions on alienation of designated class of lands allotted in the Five Civilized Tribes by Act May 27, 1908, § 9 (35 Stat. 315), the lands become subject to all state laws, including those of descent.

3. Statutes ⬤159—Earlier enactments, in irreconcilable conflict with later statutes, must fall.

Where there is an irreconcilable conflict between two statutes, the earlier enactment must fall, since later statute repeals former, when clearly inconsistent with earlier enactment.

4. Statutes ⬤181(1)—Purpose of statutory construction is to ascertain Legislature's intention.

Cardinal principal and purpose of all statutory construction is to ascertain the intention of the legislature within its expressions.

Appeal from the District Court of the United States for the Eastern District of Oklahoma; Robert L. Williams, Judge.

Suit by Thomas Tiger and others against Thomas Dewey Slinker, wherein the United

States intervened. From the decree (4 F. [2d] 714), the United States appeals. Affirmed.

Frank Lee, U. S. Atty., of Muskogee, Okl. (V. H. Biddison, of Tulsa, Okl., on the brief), for the United States.

Fred A. Fulghum, of Tulsa, Okl., amicus curiæ.

Charles R. Bostick, of Tulsa, Okl. (M. A. Breckinridge, of Tulsa, Okl., C. A. Summers, of Muskogee, Okl., and Robert M. Rainey and B. B. Blakeney, both of Oklahoma City, Okl., of counsel), for appellees.

Before STONE and VAN VALKEN-BURGH, Circuit Judges, and TRIEBER, District Judge.

STONE, Circuit Judge. A Creek allottee died intestate on March 14, 1919, without issue, leaving a husband and both parents. The husband was an enrolled Choctaw—the parents were enrolled Creeks.

[1] This controversy is whether the husband was an heir as to this allotted land. At the time of death, the Oklahoma statute (Rev. Laws 1910, § 8418) cast descent, where no issue, as follows: One-half to the husband and one-half to the parent (equal shares). If this statute governs, the husband inherits one-half. It does govern unless prevented by section 6 of the Creek Supplemental Agreement (32 Stat. 501), which provides that only Creek citizens can inherit lands allotted under the Creek Original and Supplemental Agreements—this land being so allotted.

[2] We think the Oklahoma law applies and the husband inherits. Whether the Enabling Act replaced section 6 (as contended by appellees) need not be determined, as we think that the Act of May 27, 1908 (35 Stat. 312), had this effect. That act had as one main purpose the removal of restrictions on alienation of designated classes of lands allotted in the various Five Civilized Tribes. It removed all restrictions from lands of intermarried whites, freedman and less than half blood Indians—both as to homestead and surplus lands. It removed all restrictions from surplus lands of mixed bloods having less than three-quarters Indian blood. Automatically, because restrictions were removed, the above lands became subject to all state laws, including those of descent.

The lands left restricted (until April 26, 1931, unless sooner removed by the Secretary of the Interior) were homesteads of half or greater Indian blood and the surplus lands of three-quarters or more Indian blood. The lands involved here were restricted under this act because decedent was a seven-eighths Creek Indian.

Section 9 of this act provides that death "of any allottee" shall operate to remove all such restrictions except in two instances as follows: (1) If an heir be a full blood, any conveyance by him must be approved by the state court having jurisdiction of the settlement of the estate of the decedent allottee (not involved here); (2) if there survive issue born since March 4, 1906, the homestead of the decedent allottee shall during the life of such issue until April 26, 1931, remain inalienable (unless permitted by the Secretary) "for the use and support of such issue."

This section further provides that "if no such issue survive, then such allottee, if an adult, may dispose of his homestead by will free from all restrictions" except that no will of a full blood shall be valid if it excludes the parent, wife, spouse or children unless approved by certain designated officials.

It then continues that if no such will be executed "or in the event the issue hereinbefore provided for die before April twenty-sixth, nineteen hundred and thirty-one, the the land shall then descend to the heirs, according to the laws of descent and distribution of the state of Oklahoma, free from all restrictions."

This section deals with and defines two matters: restrictions and devolution of such restricted lands. As to restrictions—except where the heir is a full blood (not involved here), it provides that all restrictions upon surplus lands shall be removed by death of the allottee; that all restrictions on homesteads shall terminate as follows: (1) Upon death of the allottee unless the described issue survive; (2) upon the death of such issue occurring before April 26, 1931; (3) in any event upon that date. The objects in view are plain—first, that all restrictions upon all allotted land (homestead or surplus) to every degree of Indian blood should terminate on April 26, 1931, in harmony with section 1 which broadly extended or continued restrictions until that date; second, to provide a homestead for surviving children born too late to go upon the allotment rolls under the Act of April 26, 1906, § 2 (34 Stat. 137); third, as soon as all such children should die, to end the restriction made for their benefit.

As to devolution: Provision is made both for disposition by will or by law, if there

be no such will. As no will was executed by this decedent, we are not concerned with the provisions concerning wills beyond the situation that they cover completely the power of all adult allottees to convey even the homestead by will. As to devolution by law —descent—the situation is as follows: The lands released from restrictions under section 1 of the act descend according to the state law. This is so, irrespective of whether section 6 of the Supplemental Agreement is effective after the Enabling Act because of two reasons: First, when Indian land is released from all restrictions on alienation it becomes as other land in the state held by non-Indians unless Congress has expressly reserved some control or placed some limitation thereon or upon the power of the Indian to deal therewith—here no such reservation or limitation appears except that a full blood must have his will approved under the conditions defined in section 23 of the Act of April 26, 1906 (34 Stat. 137, 145); second, section 4 of the act of 1908 expressly provides "that all land from which restrictions have been or shall be removed shall be subject to taxation and all other civil burdens as though it were the property of other persons than allottees of the Five Civilized Tribes," thus evincing a clear intention that such land shall be treated in all respects as ordinary real estate—it would be subject to the state laws as to voluntary conveyances and, also, as to devolution by descent.

As to restricted lands, the situation was that death of the allottee was declared by section 9 as removing all restrictions (with exceptions above discussed). Restricted allotted land must go to some one—either by will or descent. The matter of will was fully covered. Section 9 settled the matter of descent by an express declaration that it should be according to the Oklahoma law.

Appellant strives to avoid this meaning by construing the provision as to descent in section 9 as applying "only to the homesteads of such allottees as have children born after the enrollment in 1906" and dying before 1931. The language of the section is somewhat involved but necessarily so because it was defining several different, though related, matters. But if the entire section be considered this seeming confusion disappears. This section should be considered in the light of the main purposes of the entire act and the place in those purposes of section 9. This entire act dealt with restrictions. This section 9 was harmonious with this main purpose and dealt with the effect

of death of an allottee upon the allotted lands which remained restricted. It provided that death should remove restrictions except to protect certain issue not provided for by the allotment rolls. It provided that the allottee might devise the lands free of restrictions except as affecting such issue. It provided that if there be no devise and no such issue surviving, the land should descend in accordance with the Oklahoma law. The words of the section accord with the above construction and it makes complete the main purposes of the act. While the meaning contended for by appellant might be wrought from the language, yet, such meaning would lead to results which are to be avoided if possible. Of course, if the Oklahoma law of descent governed Creek restricted lands at the time the 1908 act became law, then section 9 added nothing to the existing law. If section 6 of the Supplemental Agreement was operative at the time the 1908 act became effective, the result of appellant's contention would be that the land from which restrictions were removed would descend under the Oklahoma law because it was unrestricted in the hands of the decedent; the restricted lands (except where there was issue after March 4, 1906, dying after the allottee parent but before 1931) would be governed by section 6 of the Supplemental Agreement while descent of land coming within the above exception would follow the Oklahoma law. Why should Congress make this difference in the descent of restricted land? The sole difference in situation is that in one case heirs born after March 4, 1906, have survived the allottee and later died. If they have died, the descent thereafter could not affect them. It could not affect them while living. The sole reason for protecting such issue was because they were too late to go upon the allotment rolls and receive allotments themselves as would children born a few days earlier. The protection thus afforded them was solely for their personal benefit during their life through giving them for their "use and support" (section 9) the income from such homestead during their lives until April 26, 1931. Parker v. Riley, 250 U. S. 66, 70, 39 S. Ct. 405, 63 L. Ed. 847. Again, under appellant's contention, the death of the issue prior to 1931 is a necessary element casting the descent. Thus, it might be impossible to know who were the heirs until such death. See Campbell v. Wadsworth, 248 U. S. 169, 39 S. Ct. 63, 63 L. Ed. 192, where a provision in the Seminole Agreement similar to section 6 of the Creek Supplemental Agree-

ment was involved. That would result in effectually preventing disposal of the fee by the other possible heirs (under either contingency) until such death or until 1931. The harmful effect of such prevention finds illustration in Parker v. Riley, 250 U. S. 66, 70, 39 S. Ct. 405, 63 L. Ed. 847, where it was held that oil and gas taken from restricted Creek land where such issue survived the allottee were "part of the homestead." How would it be possible to make a valid oil and gas lease on such homestead during the life of the issue unless the heirs were known and how could the homestead be protected and the income therefrom for the "use and support" of that issue (required by section 9) be secured unless such leases could be made and thus prevent drainage of oil and gas from the homestead by wells on adjoining properties? Again, what purpose could be served by confining the heirs on restricted lands where there was no such surviving issue to Creek citizens and yet permitting non-Creeks to inherit lands where such issues survived and died prior to 1931?

Thus, no purpose is shown and no reason found why Congress should have intended the construction urged by appellant. On the other hand, such construction would effectually prevent alienation by other heirs of their interests in such homestead; would make such heirship uncertain and might result in great and irreparable loss to such heirs and even to the very and only issue this restriction was designed to aid and protect. Such considerations and results are enough to deny such construction if any other reasonable one can be found. But when to the above can be added the considerations that there is another reasonable construction and one which accords with and rounds out the purposes of the entire act and of this particular section as a part thereof, there can be no hesitation in saying that the proper construction is that all lands left restricted by this act shall, upon death of the allottee intestate, descend in accordance with the Oklahoma law.

Another contention of appellant is that the only way in which section 9 could supersede section 6 of the Supplemental Agreement is by treating section 9 as repealing such section 6 and that this cannot be true because the 1908 act and section 9 thereof are general statutes while section 6 is a particular statute dealing with the Creeks only and that such implied repeals of a particular by a general statute are not permissible (citing Washington v. Miller, 235 U. S. 422, 427, 35 S. Ct. 119, 59 L. Ed. 295, and Hopkins

v. United States, 235 F. 95, this court). It is true that repeals by implication are not favored (United States v. Yuginovich, 256 U. S. 450, 463, 41 S. Ct. 551, 65 L. Ed. 1043; Johnson v. Browne, 205 U. S. 309, 321, 27 S. Ct. 539, 51 L. Ed. 816, 10 Ann. Cas. 636), and that a general law is not ordinarily construed to repeal a prior existing special law (Washington v. Miller, 235 U. S. 422, 428, 35 S. Ct. 119, 59 L. Ed. 295; Petri v. Creelman Lumber Co., 199 U. S. 487, 497, 26 S. Ct. 133, 50 L. Ed. 281; United States v. Nix, 189 U. S. 199, 205, 23 S. Ct. 495, 47 L. Ed. 775; Rodgers v. United States, 185 U. S. 83, 87, 22 S. Ct. 582, 46 L. Ed. 816). The rule is concisely stated in Petri v. Creelman Lumber Company, 199 U. S. 487, at page 497, 26 S. Ct. 133, 136 (50 L. Ed. 281), as follows:

"It is elementary that repeals by implication are not favored, and that a repeal will not be implied, unless there be an irreconcilable conflict between the two statutes. And especially does this rule apply where the prior law is a special act relating to a particular case or subject and the subsequent law is general in its operation."

[3] However, it is equally well settled that where there is an irreconcilable conflict, the earlier enactment must fall. As stated by Mr. Justice Day in United States v. Yuginovich, 256 U. S. 450, at page 463, 41 S. Ct. 551, 554 (65 L. Ed. 1043), "It is, of course, settled that repeals by implication are not favored. It is equally well settled that a later statute repeals former ones when clearly inconsistent with the earlier enactments;" and this rule applies equally to general and earlier special statutes. Washington v. Miller, 235 U. S. 422, 427, 35 S. Ct. 119, 59 L. Ed. 295. These rules are settled and the sole question is their application to the case in hand. The case of Washington v. Miller, 235 U. S. 422, 35 S. Ct. 119, 59 L. Ed. 295, held that the Act of April 28, 1904 (33 Stat. 573), did not repeal section 6 of the Creek Supplemental Agreement because the later act was general and the earlier one special and both could stand together without conflict. The act of 1904 extended the Arkansas Statutes, then in effect in the Indian Territory, to all Indians therein. There were many tribes of Indians in the territory and it was evident that the proviso in section 6 of the Creek Supplemental Agreement which dealt only with the descent of Creek allotted lands might stand without affecting the general application of all such laws to all other tribes and of all such laws, except in this particular, to the Creeks. There was no

clearly expressed congressional intent that this particular provision (section 6), affecting Creeks in one particular only, was to be superseded. The act of 1908 is different. It is specific both as to persons and as to matter dealt with therein. It expressly applies only to the Five Civilized Tribes. It applies to each and all of them. When it uses the term "Five Civilized Tribes" in the title and the body of the act, it particularly designated the Creeks as effectually as though it had specifically named them. Therefore, it was, as to the Creeks, not general, but specific. Section 9 deals expressly with "allottees of the Five Civilized Tribes" and deals specifically with the descent from such allottees. It could have been no more specific had it named the Creeks and defined the descent of Creek allotted lands. Hence, the question here is not of a general and an earlier specific statute, but of two specific statutes dealing with the same subject-matter.

[4] Of course, the proviso in said section 6 limiting heirship to Creeks could, as a matter of verbiage and as a matter of practical application, stand in conjunction with the requirement as to descent in said section 9— that is, the Oklahoma law could be substituted for the Arkansas law (Mansfield's Digest, c. 49) and the proviso be unaffected. Therefore, there is, in that sense, no irreconcilable conflict between the two. But the cardinal principal and purpose of all statutory construction is to ascertain the intention of the legislature, within its expressions. Sometimes this has been termed a "rule" of construction. It is more. It is the principle, the purpose, the object of all construction. All *rules* of construction are subsidiary thereto and exist only as aids in making that purpose effective. They are intended as shields to protect that purpose and cannot be turned into weapons to destroy it. Obviously, this question of repeal, where the language of the later act is sufficient to repeal (as here) cannot be settled exclusively by this rule of statutory construction that if the two can possibly stand together, both must be preserved. Where the language of a later statute is sufficient to cover a prior statute (general or special) and one construction would act as a repeal and another construction would not have that effect, clearly, there is an ambiguity necessitating construction in order to determine which meaning should be given the statute. If the intention of the legislature can be clearly found from any proper source, that intention must govern; if it cannot, any applicable rule of

construction may cast its weight into the doubtful scale and determine the result. Clearly, the two statutes may be examined as to their necessity and occasion to determine the intention of the legislature. McChord v. L. & N. R. Co., 183 U. S. 483, 500, 22 S. Ct. 165, 46 L. Ed. 289. By such measures must these two statutes be gauged to ascertain the intention of Congress in its later enactment. What was the purpose and the scope of this earlier statute (section 6, Supplemental Agreement) and what of this later statute (section 9, act of 1908)?

The Supplemental Agreement was supplemental to and, in a sense, corrective of the Original Agreement which shortly preceded it. The Original Agreement provided for allotment to tribal members of the lands of the tribe. The Supplemental Agreement dealt with the same subject-matter. These and all other acts allotting tribal lands of Indians contemplated and intended the ultimate removal of all restrictions upon these lands and that they would become as lands owned by ordinary citizens with all the resulting and attendant rights and obligations and no others. There is no instance of Congress ever intimating a desire that the lands of any Indian from which all restrictions had been removed should not be so regarded. Where Congress has deemed the Indian disqualified to deal with his land, it has expressed the limitations to be observed. The restrictions on alienation in these two Agreements applied only to restricted lands—in fact, defined and imposed such restrictions. The requirements as to devolution could refer only to such lands as were restricted at the time of death of the allottee. Under these Agreements, surplus lands were restricted for 5 years (unless the Secretary permitted conveyance) (31 Stat. 863, § 7) and the homesteads for 21 years (31 Stat. 863, § 7). In that situation, the Creeks might well desire to keep these lands for members of the tribe as many deaths would happen and the descent of much of this allotted land occur during these periods of restriction. The limitation in section 6 would assure this preservation of Creek ownership during these periods of years. But the act of 1908 created a different situation. It removed the restrictions as to much of this land, which thereby passed from the control of the Agreements and became, as other land, subject to all state laws, including those of descent. As to devolution of that which remained restricted, the act provided that death should remove such restrictions (except for supervision over conveyances of full blood heirs,

and the narrow class where children were born after March 4, 1906), thus making the inherited lands subject to the state laws in the hands of the heirs. Therefore, if section 6 were in full force, only this one first devolution could be affected thereby. There are no other later heirs, devolution to whom, is, or could be, affected by the act of 1908. In this much altered situation which Congress was bringing about by the act of 1908, it is difficult to see why the Creek Nation would be interested in preserving this right of Creek heirship and certainly such would be opposed to the general course of congressional action in dealing with Indians and would continue the confusion of two systems of descent in the state. The present removal (by the act of 1908) of restrictions on much of the Creek land and the removal, by death, of restrictions upon such as remained at all restricted by the act of 1908, eliminated all purpose and benefit from section 6 and when Congress declared therein (section 9, act of 1908) that descent of these very lands to these very heirs should be under the laws of Oklahoma, it expressly annulled section 6.

Three cases relied upon by appellant are not in point as the devolution of the estate occurred before the act of 1908 in each of them. In Washington v. Miller, 235 U. S. 422, 35 S. Ct. 119, 59 L. Ed. 295, the death was on November 3, 1907; in Sizemore v. Brady, 235 U. S. 441, 35 S. Ct. 135, 59 L. Ed. 308, on March 1, 1901; and in Grayson v. Harris, 267 U. S. 352, 45 S. Ct. 317, 69 L. Ed. 652, in the year 1907.

The decree should be and is affirmed.