506 F.2d 1231
 Nettie S. CROWE, a member of the Eastern Band of Cherokee
Indians, Appellee,
v.
EASTERN BAND OF CHEROKEE INDIANS, INC., and Eastern Cherokee
Tribe of Indians, Defendants, United States of
America, Appellant.
Nettie S. CROWE, a member of the Eastern Band of Cherokee
Indians, Appellee,
v.
EASTERN BAND OF CHEROKEE INDIANS, INC., Appellant.
Eastern Cherokee Tribe of Indians, and United States of
America, Defendants.
Nettie S. CROWE, a member of the Eastern Bank of Cherokee
Indians, Appellee,
v.
EASTERN BAND OF CHEROKEE INDIANS, INC., et al., Defendants,
v.
Living HEIRS OF William T. SAUNOOKE, Deceased,
Intervenors, Appellants.
 Nos. 74-1428, 74-1429 and 74-1432.
 United States Court of Appeals, Fourth Circuit.
 Argued June 6, 1974.
Decided Nov. 13, 1974.
 
 Ben Oshel Bridgers, Sylva, N.C. (Holt & Haire, Sylva, N.C., on brief), for appellants, Eastern Band of Cherokee Indians, Inc., in Nos. 74-1428 and 74-1429.
 Charles A. Hobbs, Washington, D.C. (Wilkinson, Cragun & Barker, Washington, D.C., and Orville D. Coward, Sylva, N.C., on brief), for appellant Living Heirs of William T. Saunooke in No. 74-1432.
 Herbert L. Hyde and Albert L. Sneed, Jr., Asheville, N.C., for appellee in Nos. 74-1428, 74-1429 and 74-1432.
 Before HAYNSWORTH, Chief Judge, and BUTZNER and FIELD, Circuit judges.
 FIELD, Circuit Judge:
 
 
 1
 This action was instituted by Nettie S. Crowe[1] against the Eastern Band of Cherokee Indians, Inc., an Indian Tribe, and the United States of America, alleging that her rights of equal protection and due process under the Indian Civil Rights Act of 1968, 25 U.S.C.A. 1301 et seq., (hereinafter 'Act'), were violated by the Tribe in assigning part of her lands to another. The questions raised on this appeal are (1) whether the district court properly entertained jurisdiction of the complaint, and (2) whether the court erred in finding that the plaintiff had a vested right in the tract of land claimed by her, and in setting aside the assignment by the Tribe of a portion thereof to another.
 
 
 2
 The plaintiff is one of eight surviving children of William T. Saunooke, deceased, who at the time of his death occupied a tract of land of some 59.60 acres on the Cherokee Reservation as a possessory holding pursuant to the consent of the Tribal Council. All of the lands comprising the Cherokee Reservation were conveyed to the United States of America in trust for the Eastern Band of Cherokee Indians, Inc., by deed dated July 21, 1925, and the legal title to the land, including the tract here in question, is held by the United States as such trustee.[2] On March 14, 1960, the heirs of William T. Saunooke signed a 'Land Division Agreement' under which Nettie S. Crowe was assigned the possessory interest in the eleven acre tract of land here in dispute. At the time the Land Division Agreement was executed by Saunooke's heirs, they also executed a lease to one H. R. Mitchell conveying the entire 59.60 acres upon which the lessee proposed to construct and operate 'Cherokee Wonderland.' This lease agreement, which contained a description of the eleven acre tract of land and referred to it as the possessory holding of Nettie S. Crowe, was approved by the Tribal Council on March 17, 1960, as well as by the Secretary of the Interior. Thereafter, a controversy developed between the Saunooke heirs and the lessee which was resolved by a consent judgment entered in the federal court for the Western District of North Carolina on May 14, 1962, in an action brought by Cherokee Wonderland, Inc., against the Saunooke heirs and the Cherokee Tribe. The settlement and consent order which were approved by the Tribal Council again referred to the lease and the possessory rights of Nettie S. Crowe in the tract of eleven acres. In 1970 one of the heirs of William T. Saunooke, formally requested the Tribe to divide Saunooke's land holdings and, acting upon this request, the Tribal Council instructed the Lands Committee to make an equitable division among the Saunooke heirs. The Lands Committee made a division and drafted a plat showing the respective portions assigned to each heir. The action of the Lands Committee was upheld by the Tribal Council in June of 1971. Under the division made by the Lands Committee the plaintiff was awarded 4.48 acres exclusively, plus a joint undivided interest in certain mountainside land, instead of the 11 acres claimed by her.
 
 
 3
 In her complaint, the plaintiff charged that this action on the part of the Tribal Council denied her the equal protection of its laws and deprived her of her property without due process of law in violation of 25 U.S.C.A. 1302(8).[3] The district court entertained the action, and upon the trial of the merits entered a judgment setting aside the assignment made by the Tribal Council in June, 1971, and restoring to the plaintiff her possessory holding in the eleven acres as set forth in the Land Division Agreement dated March 14, 1960, between the heirs of William T. Saunooke.
 
 
 4
 -I-
 
 
 5
 As to the jurisdictional issue, we held in United States v. Wright,53 F.2d 300 (4 Cir. 1931), that the Eastern Band of Cherokee Indians is an Indian Tribe within the meaning of the Constitution and Laws of the United States, and accordingly, absent jurisdiction under the Indian Civil Rights Act, jurisdiction of this controversy would be precluded by the well established rule 'that a tribe of Indians under the tutelage of the United States is not subject to suit without the consent of Congress * * *.' Haile v. Saunooke, 246 F.2d 293 (4 Cir. 1957); see United States v. United States Fidelity Co., 309 U.S. 506, 60 S.Ct. 653, 84 L.Ed. 894 (1940). It is equally well established that a federal court has no jurisdiction over an intratribal controversy. Motah v. United States, 402 F.2d 1 (10 Cir. 1968); Pinnow v. Shoshone Tribal Council, D.C., 314 F.Supp. 1157, aff'd, 453 F.2d 278 (10 Cir. 1971). While the district judge recognized this quasi-immunity of an Indian tribe, he held that since the plaintiff was asserting rights guaranteed to her by Title II of the Civil Rights Act of 1968, jurisdiction was conferred under 28 U.S.C.A. 1343(4).[4] In reaching this conclusion he rejected the contention of the defendant that the Act was nothing more than a declaration of rights, stating that such an argument was at variance with the rationale of the Supreme Court's opinion in Jones v. Mayer Co., 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968). We agree with this jurisdictional conclusion of the court below since section 1343(4) provides a logical and specific basis of jurisdiction and to hold otherwise would render the provisions of the Act unenforceable and an exercise in Congressional futility. See Johnson v. Lower Elwha Tribal Community, etc., Wash., 484 F.2d 200 (9 Cir. 1973). This conclusion is buttressed by the fact that it accords with the decisions of a majority of the courts who have had occasion to consider this question. Solomon v. LaRose, 335 F.Supp. 715 (D.C.Neb.1971); Spotted Eagle v. Blackfeet Tribe of Blackfeet Indian Res., 301 F.Supp. 85 (D.C.Mont.1969); Dodge v. Nakai, 298 F.Supp. 17 (D.C.Ariz. 1968).
 
 
 6
 -II-
 
 
 7
 The finding of the district court that the Tribal Council had assigned a part of the plaintiff's eleven acre tract to Bertha Saunooke and her children without giving the plaintiff any notice thereof or conducting any hearing upon the proposed division, clearly required that the defendant's action be set aside as violative of the plaintiff's due process rights under the Act. However, in going further and ordering that the plaintiff be restored to her possessory holding under the Land Division Agreement between the Saunooke heirs, it appears that the district court ignored the established doctrine of Indian sovereignty as well as the correlative concept of tribal property law.
 
 
 8
 The sovereignty of Indian tribes as 'distinct, independent, political communities' qualified to exercise the powers of self-government was first definitively recognized in the landmark case of Worcester v. Georgia, 6 Pet. 515, 8 L.Ed. 483 (1832). What has been described as 'perhaps the most basic principle of all Indian law' is that the powers vested in an Indian tribe are not powers granted by express Acts of Congress, but rather inherent powers of a limited sovereignty which has never been extinguished.[5] The scope and stature of this sovereignty was avouched by Chief Justice Marshall in Worcester, Supra, at 556.
 
 
 9
 'From the Commencement of our government, congress has passed acts to regulate trade and intercourse with the Indians, which treat them as nations, respect their rights, and manifest a firm purpose to afford that protection which treaties stipulate.'
 
 
 10
 We will not attempt a collection of the many cases which have applied the doctrine of Indian Sovereignty which was articulated in Worcester, but with few minor exceptions, it has remained viable down to the present time. In Williams v. Lee, 358 U.S. 217, 221, 223, 79 S.Ct. 269, 271, 3 L.Ed.2d 251 (1959), the Court, in construing a Navajo treaty, recognized the integrity of Indian tribal sovereignty, saying:
 
 
 11
 'Implicit in these treaty terms, as it was in the treaties with the Cherokees involved in Worcester v. Georgia, was the understanding that the internal affairs of the Indians remained exclusively within the jurisdiction of whatever tribal government existed. * * * The cases in this Court have consistently guarded the authority of Indian governments over their reservations.'
 
 
 12
 And as recently as 1973 in McClanahan v. Arizona State Tax Comm'n, 411 U.S. 164, 172-173, 93 S.Ct. 1257, 1262, 36 L.Ed.2d 129, Mr. Justice Marshall had occasion to comment upon the doctrine of Indian sovereignty:
 
 
 13
 'It must always be remembered that the various Indian tribes were once independent and sovereign nations, and that their claim to sovereignty long predates that of our own Government. * * * '* * * They were, and always have been, regarded as having a semi-independent position when they preserved their tribal relations; not as States, not as nations, not as possessed of the full attributes of sovereignty, but as a separate people, with the power of regulating their internal and social relations, and thus far not brought under the laws of the Union or of the State within whose limits they resided.' United States v. Kagama, 118 U.S. at 381-382, 6 S.Ct. 1109, at 1112, 30 L.Ed. 228.'
 
 
 14
 This doctrine of Indian sovereignty is relevant not only 'because it provides a backdrop against which the (Indian Civil Rights Act) must be read,'[6] but also because it plays an integral role in the concept of tribal property law. 'The powers of an Indian tribe with respect to property derives from two sources. In the first place, the tribe has, with respect to tribal property certain rights and powers commonly incident to property ownership. In the second place the Indian tribe has, among its powers of sovereignty, the power to regulate the use and disposition of individual property among its members.'[7]
 
 
 15
 Under the Indian concept of tribal property the ownership and use of the land is communal. The power of absolute ownership is lodged in the tribe and the interests of the individual members of the tribe are 'limited to a mere occupancy of the tracts set apart for homes with the right to free use in common of the unoccupied portion of the reserve * * *.' Cherokee Nation v. Journey-cake, 155 U.S. 196, 215, 15 S.Ct. 55, 39 L.Ed. 120 (1894). There can be no individual ownership of tribal land and the individual's right of use depends upon tribal law or custom.[8]
 
 
 16
 We recognize, of course, that the once imprecise and nebulous customs and traditions of a tribe may have been refined or formalized to some degree either by the adoption of a constitution under the Indian Reorganization Act, n9 incorporation or other tribal action. In the present case the record shows that the Eastern Bank of Cherokees was given a corporate charter by the Legislature of North Carolina in 1889.[10] This charter was amended in 1897 to confer upon the tribe the power to manage and control all tribal property either real or personal.[11] By a Resolution dated February 11, 1931, the Tribal Council Took cognizance of the numerous disputes with respect to its land, and designated the Business Committee of the Council as a court of equity to settle all disputes of land lines and to approve all sales of improvements or other changes affecting ownership or occupancy of any of the tribal lands. This Resolution further provided that in the future no trade involving the sale or lease of communal lands should be made without first obtaining the approval of the Business Committee and filing in the office of the Superintendent of the Agency a complete record of the transaction. Any trade made without such an approval and record should be considered illegal.
 
 
 17
 On October 14, 1960, the Tribal Council adopted another Resolution which recited that the records relative to possessory holdings of tribal lands were incomplete and had resulted in 'much misunderstanding among the individual members of the tribe as to their rights and the rights of their heirs in and to the tribal lands.' Under this Resolution the tribe adopted a form for a 'Certificate of Possessory Holding' which sets forth:
 
 
 18
 '(1) The authority of the Council to manage and control all property belonging to the Tribe, (2) the rights in the lands reserved by the Tribe when they recognize possessory holdings now in effect or make assignments of 'Possessory Holdings' to members of the Tribe and (3) the rights in the land assigned to individual members when assignments of 'Possessory Holdings' are made to such member.'
 
 
 19
 The certificate adopted by the Council reflects among other things, that legal title to the land is vested in the Tribe and that the power and responsibility to control the lease, transfer, inheritance or devise of the possessory holdings is retained by the Tribe.
 
 
 20
 The transfer of the eleven acres claimed by the plaintiff was never submitted for approval to the Tribal Council or any of its committees, nor was any Certificate of Possessory Holding issued to her. Despite this fact, however, the district court held that the action of the Tribal Council in approving the Cherokee Wonderland lease as well as the consent judgment in the ensuing litigation constituted approval of the Land Division Agreement between the Saunooke heirs, and that 'the assignment of the possessory rights in the eleven acre tract met the requirements of the Council and vested such rights in the plaintiff.' In the course of his opinion the district judge stated 'that the possessory holding which the plaintiff inherited from her father * * * and which was partitioned and assigned to her in severalty by the written agreement between her and the other tenants in common was a vested right sufficient to invoke due process and equal protection.' From this it would appear that the court was applying Anglo-American principles of real property law, and in so doing adopted an approach that was incompatible with the established principle that lands belong to the Indian tribe as a community and not to the members severally or as tenants in common. Sizemore v. Brady, 235 U.S. 441, 446, 35 S.Ct. 135, 59 L.Ed. 308 (1914). Such a controversy involving tribal lands should not be resolved by the application of technical rules of common law,[12] but in the light of the traditions and customs of the Indian people.
 
 
 21
 We find nothing in the statutory language or the legislative history to indicate that the Congress, in enacting the Indian Civil Rights Act, proposed to sweep aside the doctrines of Indian sovereignty and property law which have been recognized in countless treaties and scrupulously guarded by the courts for some 150 years. Such a reading of the Act would be in direct conflict with the policy which has been followed by the Government since the Indian Reorganization Act[13] designed to put a halt to the dissipation of tribal assets and to revitalize tribal government 'with power to conduct the business and economic affairs of the tribe.' Mescalero Apache Tribe v. Jones, 411 U.S. 145, 151, 93 S.Ct. 1267, 1272, 36 L.Ed.2d 114 (1973). While the object of the Civil Rights Act was to protect the individual members from arbitrary tribal action, it was not intended that the historic soverignty of a tribe be abolished.
 
 
 22
 Under the Indian Civil Rights Act the plaintiff was entitled to the right of procedural due process incident to the division of her father's possessory holdings, as well as the even-handed application of the tribal customs, traditions and any formalized rules relative to tribal land. Upon her challenge of the tribal conduct in these respects, review by the district court was appropriate, and finding comportment with the Act to be lacking, the tribal action was properly set aside. The Act, however, did not empower the court to go futher and substitute its judgment on the merits for that of the Tribe.
 
 
 23
 Accordingly, while we affirm the district court in setting aside the Council's action, we reverse the judgment below insofar as it restored to the plaintiff the possessory holding in the eleven acres of land claimed by her under the Land Division Agreement between the heirs of W. T. Saunooke. Upon remand the court should direct the defendant Indian Tribe to reconsider the division of Saunooke's possessory holdings in a proceeding which will accord to the plaintiff and the other interested parties the rights of procedural due process[14] and equal protection of the tribal laws to which they are entitled under the Indian Civil Rights Act.[15]
 
 
 24
 Reversed in part and remanded.
 
 
 
 [1]
 It was stipulated that Nettie S. Crowe is a Cherokee Indian and an enrolled member of the Eastern Band of Cherokee Indians
 
 
 [2]
 The United States was named as a party defendant because it holds the legal title to these lands in trust for the Tribe. These lands were conveyed by the Tribe to the United States pursuant to the provisions of the Act of June 4, 1924, 43 Stat. 376, 25 U.S.C.A. 331 note. An interesting and informative history of the Eastern Band of Cherokees and their lands may be found in Judge Parker's opinion in United States v. Wright, 53 F.2d 300 (4 Cir. 1931), as well as United States v. Colvard, 89 F.2d 312 (4 Cir. 1937) and United States v. Parton, 46 F.Supp. 843 (W.D.N.C. 1942), rev'd, 132 F.2d 886 (4 Cir. 1943)
 
 
 [3]
 '1302. Constitutional rights
 No Indian tribe in exercising powers of self-government shall--
 (8) deny to any person within its jurisdiction the equal protection of its laws or deprive any person of liberty or property without due process of law;'
 
 
 [4]
 1343. Civil Rights and elective franchise
 The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any persons:
 (4) To recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote.'
 
 
 [5]
 For an interesting discussion of the scope and background of Indian sovereignty, see Felix S. Cohen's Handbook of Federal Indian Law, University of New Mexico Press, p. 122, et seq. Cohen's treatise, first published in 1942 while he was associated with the Department of the Interior, is out of print and a revision published by the Department of the Interior in 1958 entitled Federal Indian Law has been the subject of some criticism. The University of New Mexico edition represents a reprint of Cohen's work as originally edited and published by him
 
 
 [6]
 McClanahan v. Arizona State Tax Comm'n 411 U.S. 164, 172, 93 S.Ct. 1257, 1262, 36 L.Ed.2d 129 (1973)
 
 
 [7]
 Cohen's Handbook of Federal Indian Law, supra, note 5, at 143
 
 
 [8]
 Prairie Band of Potawatomi Indians v. United States, 165 F.Supp. 139, 143 Ct.Cl. 131 (1958)
 
 
 [9]
 25 U.S.C. 476
 
 
 [10]
 Ch. 211, Private Laws of North Carolina, 1889
 
 
 [11]
 Ch. 207, Private Laws of North Carolina, 1897
 
 
 [12]
 The malapropos nature of such an appproach was stated in Ex parte Tiger, 2 Ind.T. 41, 47 S.W. 304, 305 (Ind.Terr.C.A.1898)
 'If the Creek Nation derived its system of jurisprudence through the common law, there would be much plausability in this reasoning. But they are strangers to the common law. They derive their jurisprudence from an entirely different source, and they are as unfamiliar with commonlaw terms and definitions as they are with Sanskrit or Hebrew.'
 
 
 [13]
 An ill-fated program to divide tribal lands among individual tribal members was initiated under the General Allotment Act of 1887, 24 Stat. 388, as amended, which authorized the President to parcel tribal lands in severalty to the individual members of the tribe and the ultimate issuance of a fee patent to the land to the allotee or his heirs. 'By all accounts, the allotment policy was a disaster. Destruction of the land base had the immediate effect of reducing tribal control of internal affairs to almost a nullity.' Comment, Tribal Self-Government and the Indian Reorganization Act of 1934, 70 Mich.L.Rev. 955, 959 (1972). Under the Reorganization Act the allotment of tribal lands is prohibited. 25 ,U.S.C. 461
 
 
 [14]
 The proceedings of the Council need not, of course, be conducted with all of the trappings of a court of law since the formality and procedural requisites are to be determined by the circumstances of any particular case. Boddie v. Connecticut, 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971). The proceedings must, however, be addressed to the issues involved in a meaningful fashion and pursuant to adequate notice. Cf. Board of Regents $v Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); Goldsberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); Armstrong v. Manzo, 380 U.S. 545, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965)
 
 
 [15]
 The court has received word that during the pendency of this appeal the defendant Tribe has conducted a new hearing, after proper notice, and has redetermined the possessory allotments of the Saunooke heirs. If, in fact, such a hearing has been conducted with full regard for the rights of the interested parties under the Indian Civil Rights Act as herein delineated, it would be unnecessary to repeat it. We, of course, are in no position to pass upon the regularity of this subsequent proceeding and express no opinion thereon