**Ambrose WHITEFOOT and Minnie Whitefoot**

v.

**UNITED STATES.**

No. 497-57.

United States Court of Claims.
July 19, 1961.
Rehearing Denied Oct. 4, 1961.

Frederick Paul, Seattle, Wash., C. Robert Mathis, Albert A. Grorud, Raymond C. Cushwa, Washington, D. C., and William L. Paul, Sr., Seattle, Wash., on the briefs, for plaintiffs.

Thos. L. McKevitt with whom was Perry W. Morton, Asst. Atty. Gen., for defendant.

REED, Justice (Retired), sitting by designation.

This is a suit to recover compensation for the taking by destruction through inundation of certain fishing rights and other rights claimed as the individual property of plaintiffs in the Columbia River near Celilo Falls in the States of Washington and Oregon by the construction by the United States of The Dalles Dam, completed in 1956.

The plaintiffs are Indians enrolled in the Yakima Nation, a confederation created and granted a reservation by the Treaty between the United States and the Yakima Nation, June 9, 1855, 12 Stat. 951. By the treaty the various tribes

composing the Nation gave up their claim by Indian title to a large expanse of territory over which they roamed in return for the United States' recognition of a portion of the area claimed under Indian title as a reservation for the Yakima Nation and its agreement to expend $200,000 for the Yakima's benefit, to furnish them schools, shops and a hospital, and to compensate individual Indians for substantial improvements, "such as fields enclosed and cultivated, and houses erected," made by such individuals upon tribal property. By this treaty the Yakima Nation secured rights recognized by the United States which could not be infringed without compensation.[1]

Then, as now, fishing in the Columbia for anadromous fish was important to the Indians and provided them their food, fresh and dried, and a medium for acquiring other commodities. In the treaty, therefore, this provision was made in article III:

> "The exclusive right of taking fish in all the streams, where running through or bordering said reservation, is further secured to said confederated tribes and bands of Indians, as also the right of taking fish at all usual and accustomed places, in common with citizens of the Territory, and of erecting temporary buildings for curing them; together with the privilege of hunting, gathering roots and berries, and pasturing their horses and cattle upon open and unclaimed land." 12 Stat. 953.

Under this authority both Yakima Reservation Indians and Indians who live off the Reservation and around Celilo Falls have continued to fish at the Falls. Cf., United States v. Winans, 198 U.S. 371, 25 S.Ct. 662, 49 L.Ed. 1089. Many of them, including plaintiff Minnie Whitefoot, claimed the exclusive right to fish at certain points or rocks away from their reservation called fishing stations. As the Commissioner found,

> " * * * the right of particular families in the tribe to use, occupy and fish from certain of the tribally owned fishing stations was a right which was respected and recognized by the Indians from remote times. This right of individual Indian families to use, occupy, and fish from specific fishing stations amounted primarily to a right, infrequently exercised, to exclude others from using the same stations. It was a right which the Indians recognized by custom and usage as passing down from one generation to the next through the family line. The right could not be sold or transferred by its immediate holder." [2]

With the growth of commercial fishing for canning purposes and the appearance of Indian fishermen without ancestral fishing stations, disputes arose as to the use of the stations. There were no records of the claimed rights. To meet this situation the Celilo Fish Committee, composed of three Indians from each of the affected reservations, plus representatives of nonreservation Indians, was organized through the local Indian Superintendents in 1935. Frequently the Committee used the "ancient Indian custom of inheritance and succession," to determine rights of fishing at stations.[3]

The growth of the Northwest and the increasing need for power and flood con-

---

1. Shoshone Tribe of Indians v. United States, 299 U.S. 476, 57 S.Ct. 244, 81 L.Ed. 360; United States v. Shoshone Tribe of Indians, 304 U.S. 111, 58 S.Ct. 794, 82 L.Ed. 1213. See Crow Tribe of Indians v. United States, Ct.Cl., 284 F.2d 361. Cf. for taking by the United States of land held under Indian title, Tee-Hit-Ton Indians v. United States, 128 Ct.Cl. 82, 120 F.Supp. 202, affirmed 348 U.S. 272, 282, 75 S.Ct. 313, 99 L.Ed. 314, et seq. See editor's comment on this case in Cohen, The Legal Conscience 239, and see idem 273 et seq., expressing a different view as to Indian title from the Tee-Hit-Ton case. See also comment on United States v. Alcea Band of Tillamooks, 341 U.S. 48, at page 273, 71 S.Ct. 552, at page 95 L.Ed. 738 of Legal Conscience.

2. Finding of Fact 6 at end of this opinion.

3. Findings of Fact 15–16.

# 660

trol caused Congress to enact water power legislation. The construction that is involved in this case is The Dalles Dam on the Columbia River between Washington and Oregon. Appropriation was made in 1950. 64 Stat. 179. Previously Congress had been advised of the fishery situation at Celilo Falls.[4] In an appropriation act for the civil functions of the Army, 1953, 67 Stat. 197, authority for compensation for the loss of the fishing rights in question was made. The act provided that, except in the case of Indians not enrolled in tribes, the payments were to be made to the respective tribes, not to the individual fishermen.[5] Pursuant to this authority an agreement was reached between the United States and the Yakima Tribe on December 17, 1954. Paragraph 2 of the agreement provided for payment to the Tribe of some fifteen million dollars for all of its fishing privileges,

" * * * as full consideration for the destruction or inundation of these usual and accustomed fishing stations within the area shown by shading upon Exhibit 'A' hereof and for the

release and subordination hereinafter set forth in paragraph 5.

\* \* \* \* \* \*

"(d) Payment shall be made by depositing the amounts, set forth in paragraphs 2(b) and 2(c) hereof, in the United States Treasury for the account of the Tribe, * * *.

"(e) No payments will be made under the agreement for the real or personal property of individual members of the Tribe or for removal of cemeteries or burial grounds. * * [or] to the individual members of the Tribe for the cost of constructing or removing temporary fishing platforms as distinct from any compensable interest which individual members of the Tribe may be able to establish in permanent fishing platforms, cableways and appurtenances."

"5. *Release and Subordination.* The Tribe, for and in consideration of performance by the Government of the obligations and terms hereof to be kept, observed and performed by the Government, by these presents

---

4. Report of Chief of Engineers, United States Army, submitted June 28, 1949, H.Doc. No. 531, 81st Cong., 2d Sess., vol. 7, 2868, 2881, 2951. Celilo Falls was named as a "usual and accustomed" fishing place.

   "*Property right in the fish.*—The Indians contend that they have a property right in the fish which migrate up the river, a right which may not be infringed upon without the payment of just compensation. The best that can be said for this question at the present time is that it is moot since the decision of the courts to date have pertained to easements in real property upon which the usual and accustomed fishing sites were located. * * * The Indian Service believe that the courts will hold that the treaties vested a property right in the annual fish migrations similar to that in the real estate upon which the fishing sites are located. The import and ramifications of such a holding are manifest. It is not believed that the treaties guarantee, or were intended to guarantee, annual fish migrations in the river, in perpetuity, or that damages will be paid by the Federal Government for any diminution of these runs from

whatever cause ensuing. * * * " Id., at 2951–2952.

5. 67 Stat. 198: "*Provided further*, That funds appropriated herein may at the discretion and under the direction of the Chief of Engineers be used in payment to the accounts of the Confederated Tribes of the Yakima Reservation; the Confederated Tribes of the Warm Springs Reservation; the Confederated Tribes of the Umatilla Reservation; or other recognized Indian tribes, and those individual Indians not enrolled in any recognized tribe, but who through domicile at or in the immediate vicinity of the reservoir and through custom and usage are found to have an equitable interest in the fishery, all of whose fishing rights and interests will be impaired by the Government incident to the construction, operation, or maintenance of the Dalles Dam, Columbia River, Washington and Oregon, and must be subordinated thereto by agreement or litigation."

   Substantially the same provision appears at 68 Stat. 331 in the similar 1954 Act.

for themselves and their agents, assigns or successors and for their people and their descendants forever, do hereby subordinate the rights of the Tribe to take fish and to build and maintain drying sheds at those usual and accustomed stations within the areas as shown shaded on Exhibit 'A', hereof, as reserved in the Treaty of June 9, 1855, 12 Stat. 951, to the right of the Government to construct, maintain, and operate the project, and do hereby release and forever discharge the Government, its officers and agents, of and from all manner of action and causes of action, suits and causes of suit, debts, damages, charges, expenses, claims and demands whatsoever, which the said Tribe or their agents, assigns or successors or their people or their descendants may now or hereafter have by reason of or resulting from the construction, operation, and maintenance of the Project, * *".

This agreement was aproved by the Yakima General Council and Tribal Council on December 17, 1954.

Minnie and Ambrose Whitefoot, members of the Yakima Tribe and residing on the Reservation, protested the per-capita distribution of the fifteen million dollar payment which gave $3,270 to each enrolled tribal member, including children of which the Whitefoots had five, on the ground of inadequacy, but accepted those portions of the money on the basis of economic necessity and without prejudice to this litigation. See Finding of Fact 22.

The respective exceptions to the Findings of Fact of the Commissioner have been examined. We are satisfied that the findings are adequately supported by the record and we approve and adopt them as our own.

The basis of plaintiff Minnie Whitefoot's claim is that she was the owner of six "usual and accustomed fishing stations" descended to her as heir of her father, recognized as hers by tribal custom and used by her through the years.[6] Defendant denies that the right to use these stations exclusively rested in Minnie Whitefoot. The issue is whether the right to use these six fishing stations, with easements on the public lands at Celilo Falls 'no different from those of other similar stations, were her individual private property or a part of the communal property of the tribe. If Minnie's claim of private ownership is found correct, she would, she argues, be entitled to a payment for the value of the use of these stations.

We have heretofore called attention to the fact that the appropriation acts authorized payments to the tribes. Here it is the Yakima Tribe. The agreement of December 17, 1954, for payment of the fifteen million dollars, quoted above, was for the destruction of the usual and accustomed fishing stations preserved to the Yakimas by the treaty of June 9, 1855, Article III, quoted above. Paragraph 5 of that agreement of 1954, also quoted above, subordinated the rights of "the Tribe to take fish." One cannot conclude from the Act authorizing payment and the contract otherwise than that the Congress, the Engineers and the Yakima Nation looked upon the fishing stations as the latter's property to be used as it might determine for its own benefit.

Such communal holding of property is in accord with normal Indian custom. Land is so held whether by Indian title or after creation of a reservation.[7] The

6. See Finding of Fact 23.

7. Prairie Band of Potawatomi Indians v. United States, 143 Ct.Cl. 131, 165 F. Supp. 139, 147, certiorari denied, 359 U.S. 908, 79 S.Ct. 587, 3 L.Ed.2d 574: "The unbroken rule of law from Johnson v. M'Intosh, 8 Wheat. 543, 5 L.Ed. 681, to date is that Indian title, unrecognized by the United States by treaty or patent, covers the right to use only, a right that may be withdrawn by the Government at any time without liability for compensation.* This right to use the land is, however, the property of the band, tribe, or nation of Indians that occupies the land, either by Indian title or a right of occupancy that is recognized by the United States by treaty. The individual's right to use depends upon tribal law or

general rights of the individual in tribal property are discussed in Federal Indian Law (1958), U. S. Government Printing Office, a revision and updating through the year 1956 of Felix S. Cohen's Handbook of Federal Indian Law. A few excerpts will show the theory.[8]

In Powers of Indian Tribes, 55 Interior Dec. 14, 50, tribal powers over property are considered at length.

custom. The tribal right to use is communal. No instance is known of individual ownership of tribal lands.**

* Tee-Hit-Ton Indians v. United States, [128 Ct.Cl. 82, [120 F.Supp. 202]], 348 U.S. 272, 75 S.Ct. 313, 99 L.Ed. 314; United States v. Band of Alcea Tillamooks, [329 U.S. 40, 67 S.Ct. 167, 91 L. Ed. 29, 103 Ct.Cl. 494, 59 F.Supp. 934], 341 U.S. 48, 71 S.Ct. 552, 95 L.Ed. 738. Cf. Northwestern Bands of Shoshone Indians v. United States, 324 U.S. 335, 65 S.Ct. 690, 89 L.Ed. 985.

** Delaware Indians v. Cherokee Nation, 193 U.S. 127, 137, 24 S.Ct. 342, 48 L.Ed. 646; Sizemore v. Brady, 235 U.S. 441, 442, 35 S.Ct. 135, 59 L.Ed. 308; Cohen, Handbook of Federal Indian Law 185, § 3, Eligibility to Share in Tribal Property. The Cherokee Trust Funds, 117 U.S. 288, 308, 6 S.Ct. 718, 727, 29 L. Ed. 880: 'The lands from the sales of which the proceeds were derived belonged to the Cherokee Nation as a political body, and not to its individual members. They were held, it is true, for the common benefit of all the Cherokees, but that does not mean that each member had such an interest, as a tenant in common, that he could claim a *pro rata* proportion of the proceeds of sales made of any part of them. He had a right to use parcels of the lands thus held by the nation, subject to such rules as its governing authority might prescribe; but that right neither prevented nor qualified the legal power of that authority to cede the lands and the title of the nation to the United States. * * * Their treaties of cession must therefore, be held not only *to convey the common property* of the nation, but to divest the interest therein of each of its members.' 26 Op. Atty.Gen. 340, 348; Seminole Nation v. U. S., 90 Ct.Cl. 151; 78 Ct.Cl. 455."

Choate v. Trapp, 224 U.S. 665, 671, 32 S.Ct. 565, 568, 56 L.Ed. 941: "The individual Indian had no title or enforcible right in the tribal property."

9 Op.Atty.Gen. 24, 28(5).

"The powers of an Indian tribe with respect to tribal land are not limited by any rights of occupancy which the tribe itself may grant to its members. The proposition that occupancy of tribal land does not create any vested rights in the occupant as against the tribe is supported by a long line of court decisions: * * *." Page 51.[9]

8. Federal Indian Law, 440–444:
"The powers of an Indian tribe with respect to property, except as they may thus be limited by Congress, derive from two sources. In the first place, the tribe has, with respect to tribal property, certain rights and powers commonly incident to property ownership. In the second place, the Indian tribe has, among its powers of sovereignty, the power to regulate the use and disposition of individual property among its members.

\* \* \* \* \* \*

"* * * Except for these general *limitations and other specific statutory* limitations found in enrollment acts and other special acts of Congress, the proper authorities of an Indian tribe have full power to regulate the use and disposition of tribal property by the members of the tribe.

\* \* \* \* \*

"Repeatedly, in the situations above discussed, Federal and State courts have declined to interfere with the decisions of tribal authorities on property disputes internal to the tribe.

"It clearly appears, from the foregoing cases, that the powers of an Indian tribe are not limited to such powers as it may exercise in its capacity as a land owner. In its quasi-sovereign capacity and in the exercise of local self-government, it may exercise powers similar to those exercised by any State or municipal corporation in regulating the use and disposition of private property, save insofar as it is restricted by specific statutes of Congress."

9. See Sizemore v. Brady, 235 U.S. 441, 35 S.Ct. 135, 59 L.Ed. 308; Halbert v. United States, 283 U.S. 753, 762–63, 51 S.Ct. 615, 75 L.Ed. 1389; Journeycake, v. Cherokee Nation, 28 Ct.Cl. 281, affirmed Cherokee Nation v. Journeycake, 155 U.S. 196, 15 S.Ct. 55, 39 L.Ed. 120.

"Under these treaties, and in December, 1838, a patent was issued to the Cherokees for these lands. By that patent, whatever of title was conveyed was con-

While property is vested in a tribe, it is the individual member who enjoys the use of the property. Federal Indian Law, supra, 757. As to fishing, this is true.[10] But, like the lands, the interests in the fisheries are communal, subject to tribal regulation.[11]

■■ We hold that the use of accustomed fishing places, whether on or off the reservation, is a tribal right for adjustment by the tribe and that the fact that certain Indians have been allowed to have sole use of a particular spot by the Tribe gives that individual no property right against the Tribe and does not limit the Tribe's right to collect the damages for obliteration of fishing spots by the dam. We hold further that Minnie Whitefoot has no claim against the United States.

■ The claim of plaintiff Ambrose Whitefoot does not involve fishing rights. His claim is for the alleged taking of two cableways leading from islands in the Columbia to the shore. Ambrose erected these cables in 1947 with the written permission of the Corps of Engineers and used them to carry fishermen and their catches across the river. Ambrose did not own the land where the cables were located, and, so far as the record shows, ownership of the land rests in the United States free of Indian title since 1855 when that was extinguished by treaty. Ambrose himself did not fish near the cables. According to Finding 24, the fishermen "in return for use of the cable * * * would sell their catch to the plaintiff [Ambrose] who then resold in the commercial market." Plaintiff removed the cables in 1956 when the flooding of the area was imminent. His claim for the alleged "value of the installation and loss of prospective profits over a ten year period" was rejected by the United States.

We may assume, without deciding the question, that compensation is recoverable in proper cases for destruction of cableways under the provision in paragraph 2(e) of the 1954 agreement for "fishing platforms, cableways and appurtenances." This, however, is clearly not such a case, for Ambrose has failed to establish that he has been deprived of "any compensable interest" in his cableways, as he must do to recover under paragraph 2(e). He has removed and salvaged his cables and machinery. The going concern value of the apparatus and the expectation of

---

veyed to the Cherokees as a nation, and no title was vested in severalty in the Cherokees, or any of them." 155 U.S. at page 207, 15 S.Ct. at page 60.

Memorandum for the Commissioner of Indian Affairs, Law Governing Leases on the Palm Springs Reservation, Oct. 21, 1938, and the Solicitor's memorandum of Aug. 11, 1937, take the same view. The latter ruling says: "All the decided cases take the view that the occupant of tribal land has no vendible interest therein but merely a usufructuary right, and that control over the land remains in the tribe save as such control has been limited by certain statutes affecting the sale and leasing of tribal land." See The Prairie Band of Potawatomi Indians v. v. United States, supra note 7.

10. "It is plain that there are only a comparatively small number of fishing locations upon the river within the reservation, and that, broadly speaking, the fishing rights upon the river belong to the tribe; but there can be fishing in the river without granting exclusive rights to defined locations.

"It does not follow, from the described conditions, that the individual Indian who wants to fish in that stream can be denied in order that, to his exclusion, fishing may be carried on for commercial purposes, in part, for the benefit of Indians of the tribe who do not care or who are not able to fish. The treaty was with the tribe; but the right of taking fish at all places within the reservation, and usual and accustomed grounds and stations outside the reservation, was plainly a right common to the members of the tribe—a right to a common is the right of an individual of the community." Mason v. Sams, 9 Cir., 5 F. 2d 255, 258. See United States v. Brookfield Fisheries, D.C., 24 F.Supp. 712, 716 (6); Seufert Bros. Co. v. United States, 249 U.S. 194, 39 S.Ct. 203, 63 L.Ed. 555; Klamath Terminal Legislation, 62 Interior Dec. 186, 203; Dukes v. Goodall, 5 Indian Territory Rep. 145.

11. Cf. Tulee v. State of Washington, 315 U.S. 681, 62 S.Ct. 862, 86 S.Ct. 1115.

future profits have, of course, been lost but the evidence is all to the effect that such value existed only at the sufferance of the United States. Ambrose had no claim to the land to which the cables were affixed, and there is no indication that he had or claimed any right, under contract, custom, or adverse possession,[12] to remain on the land for any purpose. When the Government, for good reason, withdrew its permission to remain, he did not become entitled to compensation.

The petition must be dismissed.

It is so ordered.

JONES, Chief Judge, and DURFEE, LARAMORE, and MADDEN, Judges, concur.

### Findings of Fact

The court, having considered the evidence, the report of Trial Commissioner C. Murray Bernhardt, and the briefs and argument of counsel, makes findings of fact as follows:

1. The plaintiffs, an American Indian married couple, sue to recover the fair market value of their alleged property interests in certain fishing locations and cable facilities in the Celilo Falls area of the Columbia River which were inundated and hence destroyed by the pool impounded in back of The Dalles Dam, a Federal dam completed across the Columbia River in 1956. They contend that when the Yakima Nation made a per capita distribution to each of its members of the moneys received from the Federal Government as compensation for the loss of fishing rights owned by the Nation, the rights so sold did not include the rights of individual Indians, inherited through the family line, to the use and occupancy of particular fishing locations as recognized by immemorial Indian law and customs. The following facts relate solely to the issue of liability, which was separated for trial.

2. Prior to 1855 there were several Indian tribes, collectively referred to now as the Celilo or Mid-Columbia groups, who lived along and fished in a stretch of the Columbia River now flooded by The Dalles Dam, these Indians being indigenous to the flooded area. The separate tribes constituting the Mid-Columbia Indians were the Wish-ham (variously referred to as the Wish-rams, Wish-kans, and Wah-pykts), the Wy-ams (also known as the Wyan-pam), the Skeins (variously referred to as the Skein-pah, Skein-pums, Wah-pykt), and the Kah-milt-pah (variously referred to as the Rock Creek, Kah-mulk-pam, Kah-mish-pam, Kah-mulkh-pa). The Wish-ram tribe, whose members were related closely to the Skeins, lived on the Washington side of the Columbia River eight miles below Celilo Falls proper at or near an Indian village now called Spearfish (variously known to the Indians as Nixluidix, Wish-ram, and Wishkam). The Wy-ams, many of whom were related closely to the Warm Springs Indians, lived on the Oregon side of the Columbia River opposite Celilo Falls in and near a village last known as Celilo (also referred to earlier as Wy-am). The Skeins lived on the Washington side of the Columbia River at Skein (also referred to as Wah-pykt), just below the old railroad bridge crossing the river ¾ mile below Celilo Falls.[13] The Kah-milt-pah tribal village was at Kah-mulkh, the site of the present settlement of Rock Creek, about 35 miles upstream from Celilo Falls and at the confluence of the Rock Creek with the Columbia. Celilo Falls occurred in a thirteen-mile stretch of the Columbia River situated about 17 miles upstream from The Dalles Dam.

3. Throughout recorded and unrecorded history the Columbia River system has abounded in fish, notably several varieties of salmon which have regularly ascended the river in vast numbers each year from April through September en route to their

---

12. See, e. g., United States v. 7,403.5 Acres of Land, 4 Cir., 97 F.2d 417.

13. The spelling of Indian names varies because phonetic transliteration of the language sounds is difficult. The ancient tribal village locations as reported are a reconciliation of conflicting testimony of Indians and other witnesses.

spawning grounds in the shallower reaches of the river and its tributaries. Salmon fishing, as well as year-round fishing for other species such as whitefish, steelhead trout, sturgeon and eels, has been of controlling importance to the Indian way of life, both economic and social. This has been particularly true as to the Mid-Columbia group of Indians whose ancestral grounds and villages bordered both sides of the Columbia River in the vicinity of Celilo Falls, which was the most famous of all the Indian fisheries in the Columbia River complex and the largest concentrated Indian fishery in North America. The bulk of the fish caught were preserved in ways known to the Indians. It was a staple item of their year-round diet. That which was not stored away for subsistence was used for barter with non-Mid-Columbia Indians who visited the Celilo Falls area seasonally to exchange articles needed by the Mid-Columbians. The owner of fish thus bartered retained as his own the articles received in exchange. Thus Celilo Falls was a prominent trading center for the Indians from miles around and was the scene of many Indian festivities and social events. Each spring with the catching of the first migrating salmon the Indians would hold a semi-religious ceremony known to them as the Feast of the First Salmon.

4. The Celilo Falls area was, as the name implies, a stretch of exceedingly turbulent water in the Columbia River where the river narrowed and dropped, and boulders and small islands littered the riverbed. The areas of turbulent white water were favorable to the catching of salmon as they fought their way upstream past numerous obstacles, because in white water the salmon could not so easily see and avoid the dipnets, setnets, gillnets, spears and other devices of native Indian manufacture used to catch fish. The Indian fishermen customarily fished from scaffolds perched perilously at various locations (also termed "fishing stations" and "fishing rocks") on rocks and other sites in the river most advantageously situated for the purpose. As the spring runoffs receded and the water levels in the river retreated, the fishing platforms would be lowered to other locations either on the same rocks or at other locations made more advantageous by the lowered water levels. Thus there were often several fishing stations on the same rock. Each of the hundreds of fishing stations throughout the Celilo Falls area was given an Indian name.

5. The pivotal factual issue in this claim is whether, under immemorial Indian laws and customs, the Mid-Columbia Indian tribes recognized a right in the individual tribal member, derived by inheritance through the individual's family line, to occupy a specific fishing station in the Celilo Falls fishing area to the exclusion of other Indians, including unrelated members of the same tribe. It is necessary to consider the status of this right in the first instance prior to the Yakima Treaty of 1855, and then its status subsequent thereto. The principal sources of information afforded by the record in determining this issue consist of the reputation testimony at trial of elderly Indians who have lived in the Celilo Falls area throughout their lives, and the recorded statements under oath of Indian patriarchs, since deceased, as the same appear in a report dated July 1942 prepared and published by the Division of Forestry and Grazing, Office of Indian Affairs, United States Department of the Interior, the report being entitled "Report on Source, Nature and Extent of the Fishing, Hunting and Miscellaneous Related Rights of Certain Indian Tribes in Washington and Oregon, Together with Affidavits Showing Location of a Number of Usual and Accustomed Fishing Grounds and Stations." [14] The testimony

14. At trial the Commissioner sustained the defendant's objection to the plaintiff's proffer of this report as a plaintiff's exhibit, but permitted it to accompany the record as an offer of proof. On reflection, the Commissioner has relied upon certain contents of this report, for corroboration if nothing else, realizing the extraordinary difficulty of proving ancient customs pre-existing living memory.

at trial of the Indian witnesses, most of whom spoke native Indian dialect and hence required translation as to both questions and answers, was based on recitation of customs and events rendered them years ago by their elders, who in turn derived their knowledge to some extent from what had been told them. Due to a combination of inherent translation difficulties, memory lapses, emotional traits of the Indians who readily convert legend into fact, and inexactness in mental processes of the relators, their testimony contains many contradictions. So far as the Commissioner is aware, however, the evidence offered by the parties is the best evidence available. Notwithstanding, it was possible to draw from the collective body of the record certain conclusions which it is reasonable to believe are worthy of reliance, as reported herewith.

6. The facts in this finding relate to conditions as they existed prior to the 1855 treaty. Each of the tribes comprising the Mid-Columbia group owned from ancient times its own fishing grounds, which naturally were in the immediate vicinity of the tribal village or villages. Not all members of each tribe were proficient fishermen. Those who were not performed other functions essential to tribal welfare. The Chief of the tribe customarily designated the fishermen, the hunters, and the like. These Indians did not have a private ownership concept as to real property as it is known in more sophisticated societies. Fishing stations were deemed to be the communal property of the tribe. But the right of particular families in the tribe to use, occupy and fish from certain of the tribally owned fishing stations was a right which was respected and recognized by the Indians from remote times. This right of individual Indian families to use, occupy, and fish from specific fishing stations amounted primarily to a right, infrequently exercised, to exclude others from using the same stations. It was a right which the Indians recognized by custom and usage as passing down from one generation to the next through the family line. The right could not be sold or transferred by its immediate holder. In the picturesque words of one Indian witness: "A fishing place is invaluable and inalienable, just like my body. * * * If from my own heart I sold the location, I would violate the One that made me and also the Maker of that location." The tribal chief would settle all disputes as to the right to occupy particular stations. Such factors as the lack of written records, the abundance of fish to satisfy simple subsistence and barter demands, and probably the blurring of family lines by the interrelation of all of the Mid-Columbia tribes, contributed to a lack of definition in this inherited right of usage. It is reasonable to conclude that the right to occupy certain fishing stations was coupled with a corresponding duty, subject to control by the Chief, to supply subsistence fish for the tribe, or to permit other tribal members to use these stations when not otherwise in use by the usufructuary. In these early times the supply of salmon was greatly in excess of the local demand, and the seasonal requirements for a family were obtained with little time or effort. Consequently it is readily understandable why those Indians who enjoyed a right to use particular fishing stations were so free in permitting their relatives and friends to use these stations when they were not in use, and apparently the possessors of these rights were generous in this respect without, however, relinquishing their ultimate claim of priority which had descended through the family. The Mid-Columbia tribes dwelling on either side of the Columbia River at Celilo Falls frequently used each other's tribal fishing grounds in a fraternal manner. There was not much direct use of the Celilo Falls fishing area by non-Mid-Columbia Indians, for such Indians were not familiar with the methods used by the local Indians to catch salmon, but they were permitted to fish if they wished to satisfy their own requirements. On the occasions when non-Mid-Columbia Indians did fish there, they did so only with permission of the tribal chiefs of the Mid-Columbia Indians, and not as a matter of right.

7. The ancient customs of the Mid-Columbia Indians pertaining to the right to use and occupy particular fishing stations in the Celilo Falls area, as described in the preceding finding, were in effect when the Yakima treaty was negotiated in 1855. The treaty, which was ratified by the Senate on March 8, 1859, and appears in 12 Stat. 951, was negotiated between representatives of the United States Government and of 14 separate tribes confederated as the Yakima Nation. Three of the 14 tribes comprising the Yakima Nation were of the Mid-Columbia group, namely, the Wish-ham, the Skein-pah, and the Kah-milt-pah.

8. Under Article II of the Yakima Treaty, an extensive reservation was created, situated about 90 miles north of the Columbia River in what is now the central part of the State of Washington. In return, the Yakima Nation ceded all of its claims to a larger area of land lying generally north of the Columbia River and containing the reservation land mentioned above. Article II also provided that all of the bands and tribes constituting the Yakima Nation would move to the reservation within one year after ratification. A small number of the Indians, primarily those of the Wish-ham tribe, did not comply with this provision of the treaty but continued to reside at their ancient sites on the public land along the north bank of the Columbia River at Celilo Falls. Some of these Indians later enrolled in the Yakima Nation but some of them never did.

9. Article III of the treaty provided, in part, as follows:[15]

"The exclusive right of taking fish in all the streams, where running through or bordering said reservation, is further secured to said confederated tribes and bands of Indians, as also the right of taking fish at all usual and accustomed places, in common with the citizens of the Territory, and of erecting temporary buildings for curing them; together with the privilege of hunting, gathering roots and berries, and pasturing their horses and cattle upon open and unclaimed land."

10. Article X of the Yakima Treaty provided as follows:

"*And provided,* That there is also reserved and set apart from the lands ceded by this treaty, for the use and benefit of the aforesaid confederated

15. The plaintiffs have requested a finding which, in effect, defines the interpretation placed upon Article III of the treaty by the Indian signatories contemporaneous with its negotiation, specifically as to the continuation of the status quo in the ownership of the Celilo Falls fisheries by the Mid-Columbia Indians. Beyond the impossibility of ascertaining at this date the subjective mental processes of the Indians in 1855, it is manifestly useless to try to do so. The treaty was dictated by white conquerors of a subjugated race. It is inconceivable that there was the kind of arms-length bargaining as to terms which would have made relevant as ascertainment of the Indian intention. Naturally the Indians wanted the unattainable—to be left alone. It is doubtful that the untrained Indian mind understood the ambiguities of Article III even though the white representatives went to some pains to explain the provision. A great and unbridgeable void existed between the language and culture of the two races. When one considers that the meaning of Article III was sufficiently in doubt as to require the interpretative services of the Supreme Court and several lesser courts in subsequent years, one can readily forgive the Indians for any lack of perspicacity or, indeed clairvoyance. Illustrative of the attitude of the Yakima representatives at the meetings in 1855 between the white and Indian representatives, Chief Kamaiakum, who was head of the delegation representing the 14 tribes about to confederate into the Yakima Nation, displayed an apathetic indifference to the proceedings, as though the complexities were too tiring to comprehend or bother about. He expressed only a confidence in the altruism of the white Americans and a strong desire to get back to his vegetable garden. It is more important to observe, as subsequent findings endeavor to do, the post-treaty conduct of the parties as to the Celilo Falls fisheries. As will be seen, the Indian traditions and customs remained intact for many years before accumulating circumstances forced a determination of the effect of the treaty upon the rights in question.

tribes and bands, a tract of land not exceeding in quantity one township of six miles square, situated at the forks of the Pisquouse or Wenatshapam River, and known as the 'Wenatshapam fishery', which said reservation shall be surveyed and marked out whenever the President may direct, and be subject to the same provisions and restrictions as other Indian reservations."

This area was later sold to the United States by the Yakima Nation for the sum of $20,000, pursuant to the Treaty of January 8, 1894, 28 Stat. 320. In 1956 the Indian Claims Commission found that the amount paid was too small and awarded the Yakima Nation an additional sum of $49,000 (4 Ind.Cl.Comm.).

11. Negotiations with respect to lands on the south or Oregon side of the Columbia River in the Celilo Falls area were carried on with the group known as the "tribes of Middle Oregon". These included the Wy-ams (one of the Mid-Columbia group), the Tenino band of the Walla-Wallas and the Dallas band of the Wascoes. These Indians, later known as the Confederated Tribes of the Warm Springs Reservation of Oregon, ceded all their rights to certain lands south of the Columbia and in return agreed to move to a reservation located some distance south of the river. The original treaty with these Indians, 12 Stat. 963, contains the following provision (p. 964):

" * * * Provided, also, That the exclusive right of taking fish in the streams running through and bordering said reservation is hereby secured to said Indians; and at all other usual and accustomed stations, in common with citizens of the United States, and of erecting suitable houses for curing the same; also the privilege of hunting, gathering roots and berries, and pasturing their stock on unclaimed lands, in common with citizens, is secured to them."

Some of the usual and accustomed fishing places referred to in this treaty were located in the same Celilo Falls area used by the Mid-Columbia Indians.

12. After the 1855 treaty most of the Indians in the 14 tribes comprising the newly federated Yakima Nation moved to the reservation. Some of the Indians, particularly those from the Wish-ham tribe, did not move to the reservation but remained at their old village on the Washington side of Celilo Falls where they devoted most of their time to fishing and living much as they had in the past. The Wy-am tribe did not move to the Warm Springs reservation but remained behind at its village on the Oregon side of Celilo Falls, and continued to live and fish at Celilo Falls as in the past. The Wy-ams who remained behind did not affiliate with any treaty tribe.

13. For an indeterminate period after the 1855 treaty the customs of the Indians who fished at Celilo Falls remained little changed, except that the area had a much smaller permanent Indian population due to the removal of most of the indigenous Indians to the reservations in Washington and Oregon created by the treaties. Many Indians who had been removed from the Celilo Falls area to the reservations would return each year to their usual and accustomed fishing stations at Celilo Falls and obtain fish for their own subsistence. The record contains no mention of any interruption of the customs previously described until the advent of commercial fishing.

14. There is evidence that commercial fishing by both Indians and whites commenced as early as 1883.[16] Commencing about then commercial interests owned by white men and presumably licensed by the State installed fish wheels at prime locations in the Celilo Falls area. Fish

16. See United States v. Brookfield Fisheries, D.C., 24 F.Supp. 712, which refers to a commercial fish wheel being installed by a non-Indian about 1883 or shortly thereafter. Seufert v. Olney, 9 Cir., 193 F. 200, refers to commercial fishing by Indians and non-Indians as early as 1893, and the existence of a state licensing procedure for commercial fishing.

wheels were, as the name implies, rotating devices which scooped up quantities of fish from channels constructed in the river through which the fish were induced to come as they swam upstream. They caught salmon in large quantities and made inroads on the quantity of fish available to the Indians. Numerous disputes arose between the whites and the Indians, some of which were determined in court proceedings in which the United States represented the interests of the Indians and successfully enforced the official version of their rights under the 1855 treaty. Canneries were built in the area to process the commercial salmon catch. A season for commercial fishing was established by state regulation. The Indians participated in commercial fishing and also fished during the off season for subsistence requirements, which was a right not accorded non-Indians. On many of the Indian fishing sites the fishing was done by "companies", i. e., groups of Indians who would pool their resources and their fishing efforts in order that during the heavy salmon runs a particular site might be fished on a 24-hour basis, even though night fishing violated traditional Indian conservation policy. The proceeds of the catch were divided equally among members of the company. Indians retained the proceeds of their commercial sales as their own and did not deposit it in the tribal fund.

15. Despite competition with white commercial fishermen the Mid-Columbia Indians for some years managed to catch enough salmon to meet their subsistence requirements and to derive an income from commercial sales. Sometime between 1920 and 1930 a highway was constructed leading to Celilo Falls on the Oregon side. Until then the Mid-Columbia Indians had suffered no pronounced interference with their fishing locations from other Indians. Beginning about the time the highway was constructed non-Mid-Columbia Indians, most of whom were members of the three adjacent Indian reservations (Yakima, Warm Springs, and Umatilla) and whose individual tribal ancestors had not had fishing stations at

Celilo Falls, slowly infiltrated into the Celilo Falls area to fish from both old established stations as well as new locations which they opened up. Disputes arose among the various Indians as to who had priority rights to the use of particular fishing stations. In addition, problems arose with respect to application of the state laws of Washington and Oregon to commercial fishing by treaty Indians and with respect to the rights of Indians as against the claims of some white men. The local superintendents of the said three Indian reservations announced and enforced a policy which is reflected in the following passages from the April 23, 1931, letter of the Superintendent of the Yakima Indian Agency to his wards:

"Dear Friends:

"The open season for commercial fishing of salmon will soon be here. During my brief time at Yakima Agency I have been advised by various Indians of disagreements and quarrels arising over fishing locations. I have reviewed the office files concerning fishing and fishing rights among the Yakimas, and notwithstanding that there seems to be a traditional understanding among the members of the tribe that locations occupied by forefathers give families right of succession, I do not find in the treaty or the files any information giving any particular member of the tribe any specific location, or the right to acquire the same.

"The conclusion, therefore, must be that all have rights 'in common'; that all members of the Yakima tribe have equal rights. * * *.

"The effort of certain members of the tribe to monopolize the fishing privileges is frowned upon and does not meet with the approval of this office.

"It has also come to my attention that certain Indians have threatened others in connection with fishing locations. Such threats are apprehensible. [sic. reprehensible?] * *."

This letter created considerable discussion among the Indians for many years as to its meaning, for many of the Mid-Columbia Indians disagreed that it correctly expressed the intent of the 1855 treaty. However, the practical effect of the letter on Indian fishing at Celilo Falls was to give legal sanction to the commercial fishing activities of Indians from the reservations whose claim to fishing privileges at Celilo Falls rested exclusively upon the 1855 treaty and not upon a claim of inheritance of particular stations from ancestors in the Mid-Columbia group of Indians, thus accelerating the influx of these Indians into the Celilo fishing area. Rising prices for commercially sold salmon gave added stimulus to the invasion. It was probably in this period that the traditional Indian custom with respect to the lineal inheritance of fishing stations received its first effective tests in the course of rivalry for choice locations. Moreover, the conditions as described caused a shortage of fish and stations to fish from, which conditions had not previously existed in similar degree. It was contended by the alleged interloping Indian fishermen from the reservations that the 1855 treaty had extinguished the exclusive rights of the Mid-Columbia Indians, and the newcomers no longer respected the authority of the Mid-Columbia tribal chiefs in the preservation of law and order. The income of the Mid-Columbia Indians who lived at Celilo Falls depended almost solely on proceeds of their commercial fish sales, whereas the Indians from the nearby reservations had opportunities for income from grazing, cattle-raising, timber sales, etc., even though such income was largely tribal income which was distributable to the members.

16. At the instigation of the superintendents of the Yakima, Warm Springs and Umatilla Reservations, an organization was formed in 1935 known as the Celilo Fish Committee. This committee consisted of three Indian representatives from each of the three reservations, two from Celilo, and one from Rock Creek, Washington. The Rock Creek and Celilo representatives represented the Indians who had remained in the Celilo Falls area through the years and had not moved to the reservations. The objectives of the committee as stated in its bylaws were as follows:

Article 3—"Objectives.

"The objectives of the committee shall be:

"1. Promotion of interests of Indians as to fishing within the territory designated in Article two.

"2. To assist the Superintendents of the Indians represented in administration of fishing matters.

"3. To cooperate with State fish and game authorities in the protection of Indian fishing rights under the treaties with the Indians herein concerned.

"4. Promotion of law and order among the Indians gathered at the fishing grounds within the territory herein designated.

"5. To promote the idea within the territory herein designated that fishing for family and personal use for feed shall have precedence over commercial fishing to the end that all Indians represented by the committee shall have proportionate opportunity in light of family requirements to take fish for family and personal use as food."

Meetings of the Fish Committee were held regularly in the months of April, May, June and September of each year. Each meeting was attended by the superintendents of each of the Indian agencies governing the three reservations, or their representatives. The Committee functioned upon occasion in the manner of a court. Complaints by individual Indian fishermen were made in writing, witnesses were interrogated and testified at the meetings, elaborate minutes were maintained, and the Committee would render decisions. The Committee was laudably designed as a means for the Indians in the area to work out their own problems instead of referring these problems to the various Indian agencies. Faced with the

impossible problem of trying to accommodate conflicting interests and claims, the Committee's decisions were dictated as much by expediency as by rigorous adherence to firm policies. For example, one of the policies most frequently invoked in resolving disputes as to fishing stations was to apply the ancient Indian custom of inheritance and succession, a policy naturally favored by the Mid-Columbia tribal representatives and resisted by the representatives of those tribes which had no claim by inheritance but rested their claims on the 1855 treaty. Other policies which were often used and reflect the effort of the Committee to meet competitive realities were that of rotating fishermen at particular locations, and giving priority to subsistence fishing over commercial fishing. In June 1942, for example, the Committee refused to endorse a policy recognizing Celilo Falls as a "free fishery", i. e., one where any members of the three reservations could fish as a treaty right regardless of whether they or their tribes had inherited individual or tribal rights to use certain locations. Later, particular areas at Celilo Falls were decreed by the Committee to be "free fisheries" in that sense. The Fish Committee had no real authority and, while its determinations of rights as between disputants were often followed, in the course of time its authority eroded and was not respected by the more aggressive Indian fishermen. Whereas by historical tradition and custom the permission of the Indian holding an inherited right to occupy a fishing station was virtually required before an Indian not having such a right could fish there, for some years prior to the end of fishing at Celilo Falls "claim-jumping" was a common practice that the Fish Committee had no real authority to prevent.

17. In the Act of May 17, 1950, 64 Stat. 163, 179, Congress authorized construction of The Dalles Dam to be located in the Columbia River near the town of The Dalles, Oregon. Construction of this dam called for creation of a reservoir that would raise the water level in the Celilo Falls area and necessarily flood out existing fishing sites. In view of the expected interference with Indian fishing activities, the Corps of Engineers entered into negotiations with those groups of Indians who had reserved fishing rights there pursuant to the 1855 treaty, including the Yakimas, the Warm Springs, the Umatillas, the Nez Perces, and certain individual Indians who lived and fished traditionally in the Celilo Falls area but who were not enrolled in any particular reservation. This latter group consisted principally of Indians of the old Wishham, Wy-am and Skein tribes who recognized Chief Tommy Thompson as their chief. The Yakima Nation initially refused to negotiate and sought, instead, to have Congress reverse its decision to construct The Dalles Dam. When the dam was under construction and the other Indian groups mentioned were negotiating with the Engineers, the Yakimas capitulated and their General Council appointed a committee representing the Yakima Nation in the negotiations.

18. Throughout their negotiations with the Indians the Corps of Engineers proceeded on the basic premises (1) that a right to occupy a certain fishing location as recognized under tribal custom was not a property right susceptible to "ownership" in a legal sense, because under neither Indian custom nor American law could such a right be conveyed or sold, and (2) that all of the Indian fishing rights at Celilo Falls were strictly tribal rights created by the 1855 treaty. These were also the beliefs of the members of the Indian committee representing the Yakima Nation in the negotiations, who thus dickered only to obtain payment for the tribal rights in the fisheries. The Engineers did not negotiate with individual Indian fishermen to acquire any rights which they might claim as individuals entitled under Indian tribal custom to occupy and use, but not to sell, specific fishing stations. The Engineers representatives knew that there were many more Indians enrolled in the Yakima Nation who did not depend on the Celilo Falls fisheries for a living than those that did, and also that the Indian fishermen re-

tained the proceeds of their fish sales as their personal property instead of turning it in to a tribal fund. In contrast, proceeds from the sale of timber on tribal lands or from leasing of tribal property in any other form are placed in the Treasury of the United States and are either used for general tribal purposes or are distributed to tribal members on a per capita basis. Indian law and custom in this region had no equivalent to ownership of conveyable interests in real property as this is known in formal legal systems.

19. In the course of their efforts to reach some satisfactory adjustment with the various Indian groups, the Engineers determined that the total value of Indian fishing rights that would be lost by construction of the dam, covering a stretch of about ten miles upstream from The Dalles, Oregon, was the sum of $23,274,-000, which was based upon a capitalization at three percent of the total value of the fish caught by the Indians in an average year and sold commercially or to tourists or used for subsistence. Later this figure was increased to $26,888,395.-32. It was decided to split this sum among the various tribes and the unaffiliated Indians at Celilo Falls on the basis of their official Indian populations enjoying fishing rights there either under the 1855 treaty or by historical usage. Reducing the total value to a unit basis of $3,754.91 per Indian, it was determined that the Yakima Nation should receive $15,019,640, the Umatillas, $4,606,971.06, the Warm Springs, $4,451,784.26,[17] the Nez Perce, $2,800,000, and $3,754.91 each for some 15 or 16 Indian fishermen at Celilo Falls who (1) were unaffiliated with any reservation (2) depended on the fisheries for a livelihood, (3) had established traditional fishing rights over a period of many years to the satisfaction of the Ce-

lilo Fish Committee, and (4) had no determinable rights under the 1855 treaty. The Acts of 1953 (67 Stat. 197) and 1954 (68 Stat. 331) authorized payment not only to tribes but also to the unaffiliated Indians at Celilo Falls who met the tests described above.

20. On December 17, 1954, an agreement was entered into between the United States and the Yakima Nation whereby the latter agreed to subordinate its fishing rights in the Celilo Falls fisheries in return for payment of the sum of $15,-019,640. This agreement was approved by both the General Council and the Tribal Council of the Yakima Nation. Similar agreements were entered into with the Nez Perce, the Umatillas and the Warm Springs Indians. Pertinent provisions in the agreement with the Yakima Nation were as follows:

"2. (b) * * * the tribe does hereby subordinate the right to use those usual and accustomed fishing stations * * *.

\* \* \* \* \* \*

"(e) No payments will be made under the agreement for the real or personal property of individual members of the Tribe or for removal of cemeteries or burial grounds. * * It is recognized, however, that the cost of construction of temporary fishing platforms at the Indian fisheries is an item of fishing expense incurred by the individual members of the Tribe, but since the cost of said temporary fishing platforms has been considered and evaluated in arriving at the tribal value set forth in paragraph 2(a) above, it is agreed that no separate or additional payment will be made by the Government to the individual members of the Tribe for the cost of construct-

17. The treaty of June 25, 1855, with the Warm Springs Indians (12 Stat. 963), secured their rights to their usual and accustomed off-reservation fishing locations in common with others. By the treaty of November 15, 1865 (14 Stat. 751), the Warm Springs Indians relinquished these off-reservation fishing rights for a con-

sideration. Curiously, the record does not explain why the Warm Springs Indians should have shared in the Government's payments for Indian fishing rights resulting from The Dalles Dam inundation of the Celilo Falls fisheries, when they had clearly relinquished such rights many years earlier.

ing or removing temporary fishing platforms as distinct from any compensable interest which individual members of the Tribe may be able to establish in permanent fishing platforms, cableways and appurtenances.

\*   \*   \*   \*   \*   \*

"5. *Release and Subordination.* The Tribe, for and in consideration of performance by the Government of the obligations and terms hereof to be kept, observed and performed by the Government, by these presents for themselves and their agents, assigns or successors and for their people and their descendants forever, do hereby subordinate the rights of the Tribe to take fish and to build and maintain drying sheds at those usual and accustomed stations within the areas as shown shaded on Exhibit "A" hereof, as reserved in the Treaty of June 9, 1855, 12 Stat. 951, to the right of the Government \* \* \*, excepting only the rights of individual Indians to compensation for damages to tangible property, individually owned other than temporary fishing platforms, and as otherwise provided in par. 10 hereof. \* \* \*.

\*   \*   \*   \*   \*   \*

"10. *Claim 147.* It is understood and agreed that the Yakima Tribe reserves in the settlement agreement herein the right to continue the prosecution of Case No. 147 entitled, 'The Yakima Tribe of Indians Vs. the United States', now being prosecuted before the Indian Claims Commission.

\*   \*   \*   \*   \*   \*

"13. *Approvals.* This agreement shall be subject to the approval of the Chief of Engineers, Department of the Army, the Commissioner of Indian Affairs and the Secretary of Interior, Department of Interior, or their duly authorized representatives, and by a majority of the voting adult members of the Tribes at an official meeting of the Yakima General Council in accordance with the regular rules of the Tribe, and shall not be binding until so approved."

In addition to being signed by duly authorized representatives of the Government, the agreement was also signed by the Yakima Tribe of Indians (synonymous with the Yakima Nation) acting by and through their Tribal Officials, consisting of the signatures of the Chairman and the Secretary of the Yakima General Council, the Chairman and Secretary of the Yakima Tribal Council, and Chairman of the Negotiating Committee for the Yakimas, and was approved both by the Tribal Council for the Yakimas and by the Secretary of the Interior and the Commissioner of Indian Affairs.

21. The General Council and the Tribal Council are the internal governing bodies of the Yakima Nation. The General Council is an assembly of all the members of the Yakima Nation and its meetings are called once or twice a year by the Chairman, who is elected by the enrolled Indians at large. The General Council discusses issues of great importance referred to it. The Tribal Council was established by the General Council in 1947 to administer internal affairs in the reservation. It consists of one representative from each of the 14 original tribes which confederated in 1855 to establish the Yakima Nation. These councils operate with the approval and sponsorship of the Bureau of Indian Affairs, and there is no reason to believe that they are not authorized and responsible representatives of the Yakima Nation.

22. After the sum of $15,019,640 had been paid to the Yakima Nation the General Council adopted a plan, approved by the Secretary of the Interior, whereby a per capita distribution of this fund was made to all of the members of the Yakima Nation appearing on the rolls, including children, as of October 25, 1957. Under this plan, those who wished to receive their per capita shares made application for payment. The full share of each such enrolled member was fixed at $3,270. Pursuant to such applications a per capita

payment of $3,270 each has been made to and accepted by the plaintiffs Ambrose and Minnie Whitefoot and to each of their five sons and daughters. The plaintiffs accompanied their application for their pro rata share of the tribal fund with the following letter of protest dated August 28, 1958:

"Gentlemen:

"You are advised that the undersigned, Ambrose Whitefoot and Minnie Whitefoot, his wife, protest the amount they are to receive for the loss of their fishing rights in the shaded area of The Dalles Dam.

"We believe that the Tribe was wrong in selling our individual fishing rights.

"Now that we have no fishing rights, our livelihood has been destroyed and we are having a hard time finding money to eat. Therefore, economic necessity drives us to accept the little that you are offering. But we must tell you that we are accepting the money under protest and without prejudice to our lawsuit in the Court of Claims."

23. *a.* The plaintiffs are both enrolled members of the Yakima Nation and reside on the reservation. Minnie Whitefoot claims that she is the owner, by inheritance from her father, of six fishing stations in the now flooded area designated under a numbering system established by the United States Fish and Wildlife Service as Numbers 82, 83, 87, 88, 89 and 90, situated approximately five miles west of Celilo Falls and four miles east of the city of The Dalles, at a place called Tenino, Oregon. The defendant contends that the evidence fails to establish that these fishing stations were usual and accustomed Indian fishing locations in 1855, or that if so the right to use and occupy them exclusively was vested in the plaintiff Minnie Whitefoot through her family line in accordance with Indian custom.

*b.* Minnie Whitefoot claims the disputed fishing stations through her father who was an enrolled member of the Yakima Nation and was by birth a member of the Wish-ham tribe which was indigenous to the Spearfish area along the Washington side of the Celilo Falls fishing grounds. He died about 1939 at the age of 104 years, which should have made him quite authoritative as to the status quo in 1855. He had been employed for many years as a native policeman on the reservation and was not a fisherman, although he told the plaintiff Minnie Whitefoot that he used to fish as a young man and, during her lifetime, would go to the fishing grounds quite frequently and return home with fish for subsistence. She never saw her father fish at the stations in suit, but he told her that he had inherited the locations from his mother, who had been a Wascopum Indian, which tribe had been absorbed into the Warm Springs Federation as one of the Middle Oregon tribes. Neither of the plaintiffs knew the Indian names for each of the separate fishing stations in suit, but the name of the "hole" where they were located was Wok-push. Minnie Whitefoot's father spoke the Wasco language which she did not understand. The plaintiffs were married in 1918 and the plaintiff Ambrose Whitefoot had fished at these stations each year since about that time, assisted by their sons. He kept part of the catch for subsistence purposes and sold the rest commercially to the cannery. She did not fish since Indian women did not engage in that occupation, but she cured and otherwise preserved the subsistence fish, which was women's work among the Indians. In addition to fishing at the stations in suit, the plaintiff Ambrose Whitefoot and his sons fished commercially at certain other locations in the Celilo Falls area, particularly after the spring fishing season when the water level had fallen too low for fishing at the locations in suit. The locations in suit were primarily useful for spring fishing during the high stages of the river resulting from the spring runoffs.

*c.* It is manifestly impossible to procure positive proof that the six fishing stations in suit were in use by the Indians

in 1855. The locations appear, along with many others, on a map in evidence purporting to show Indian fishing sites in the Celilo Falls area in 1952, admittedly not unequivocal proof in itself that the locations shown had always been such as early as 1855. Having been born prior to 1855, the father of the plaintiff Minnie Whitefoot should have been in a position to correctly inform the plaintiff, as she testified he did, that the locations in suit were usual and accustomed Indian fishing places which he had inherited from his mother. It is worthy of belief and so found that the locations in suit were not only usual and accustomed Indian fishing sites, but that also the plaintiff Minnie Whitefoot inherited through her father and his mother before him the right to use, occupy and fish from these locations. The voluminous and detailed minutes of meetings of the Celilo Fish Committee do not indicate that any dispute was ever brought before the Committee since its formation in 1936 questioning the plaintiffs' rights to the said locations.

24. The plaintiff Ambrose Whitefoot does not claim to have been the owner of any fishing locations. His claim is for the alleged taking of two cables, one extending between Chief Island and Standing Island and the other running between Standing Island and the mainland at Celilo, which he erected for the purpose of permitting the transportation of fishermen and their catch between the islands and the mainland. This cableway was erected by the plaintiff in 1947 with the permission of the Corps of Engineers. In return for use of the cable to go back and forth from the mainland to the islands various Indian fishermen would sell their catch to the plaintiff who then resold in the commercial market. The islands referred to are located in the immediate vicinity of Celilo Falls, five miles from the fishing sites at Tenino claimed by the plaintiff Minnie Whitefoot. The cableways had no connection with or relationship to the fishing sites claimed by Minnie Whitefoot. Plaintiff did no fishing at the cableways location and had no title to any of the land to which the cableways were anchored. When informed that The Dalles Dam was to be put into operation, the plaintiff removed his cableways about November 1, 1956. Thereafter, he presented a claim to the Corps of Engineers for the sum of $76,116.48, including the alleged value of the installation and loss of prospective profits over a ten-year period resulting from plaintiff's inability to continue his fish-purchasing business. The claim was rejected by the Corps of Engineers and was subsequently rejected also by the Comptroller General of the United States.

### Conclusion of Law

Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiffs are not entitled to recover and the petition is dismissed.

